# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Reissued for Public Availability Date: March 2, 2026

```
* * * * * * * * * * * * * * * * * * * * * * * *
JOSHUA SCHULZ,                       *
                                     *
              Petitioner,            *    No. 19-1863V
                                     *
                                     *    Special Master Christian J. Moran
v.                                   *
                                     *    Filed: August 28, 2025
SECRETARY OF HEALTH                  *
AND HUMAN SERVICES,                  *
                                     *
              Respondent.            *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Joshua Schulz, pro se, La Vernia, TX;
Lauren Kells, United States Dep't of Justice, Washington, DC, for respondent.

## ORDER DENYING MOTION FOR APPOINTMENT OF COUNSEL AND DECISION DENYING ENTITLEMENT TO COMPENSATION[12]

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

[2] Pursuant to Vaccine Rule 18(b), this Order and Decision was initially filed on August 28, 2025, and the parties were afforded 14 days to propose redactions. The parties did not propose any redactions. Accordingly, this Order and Decision is reissued in its original form for posting on the Court's website.

Mr. Schulz's case is pending in the Vaccine Program.  Presently, he is seeking judicial intervention on various issues, including an appointment of counsel and a ruling that he is entitled to compensation because an influenza ("flu") vaccine caused him to suffer transverse myelitis.[3]  Mr. Schulz is not eligible for either form of relief.  Thus, these two motions are denied.

## APPOINTMENT OF COUNSEL

Citing 28 U.S.C. § 2503 and 28 U.S.C. § 1915, Mr. Schulz requests that an attorney be appointed for him.  Pet'r's Mot. for Court Appointed Counsel, filed June 20, 2023.  Mr. Schulz maintains that the Court of Federal Claims may appoint attorneys to represent petitioners who would otherwise represent themselves when the circumstances are exceptional.  He further argues that his case is exceptional because without an attorney he has been unable to retain an expert.  Id. at 2; Pet'r's Reply, filed July 17, 2023 at 6-7.

The Secretary opposes.  Resp't's Resp., filed July 12, 2023.  The Secretary maintains that special masters lack the legal authority to appoint attorneys.  Id. at 3, citing Patton v. Sec'y of Health & Hum. Servs., 25 F.3d 1021, 1026-27 (Fed. Cir. 1994).  The Secretary further argues that the "extreme circumstances" under which an authorized judicial officer might appoint an attorney include "quasi-criminal proceedings," "severe civil remedies," and cases involving child custody.  Id., citing Washington v. United States, 93 Fed. Cl. 706, 708 (2010).

Whether special masters may and should appoint attorneys for pro se petitioners seems not to be an open and shut issue.  About six months before the parties submitted their arguments, the Federal Circuit appointed an "amicus to support [an] appeal" lodged by a pro se petitioner-appellant.  DiMasi v. Sec'y of Health & Hum. Servs., No. 2022-1854, 2022 WL 20272146, at *2 (Fed. Cir. Dec. 19, 2022).  In ordering the appointment of an amicus, the Federal Circuit did not cite any authority.  The lack of express reliance upon an authority, in turn, clouds any analysis about when courts may appoint attorneys.

The situation in DiMasi is not exactly on all fours with Mr. Schulz's case in at least two respects.  Yet, whether these differences are material is not entirely clear.  First, the Federal Circuit is an Article III tribunal.  In contrast, the Office of Special Masters is an adjunct to the Court of Federal Claims, an Article I tribunal.  However, if the Federal Circuit determined that it, in the course of hearing an

---

[3] Mr. Schulz also seeks judicial intervention on a third issue: reimbursement of costs he has incurred while representing himself.  This motion remains pending.

appeal from a disappointed petitioner from the Vaccine Program, would benefit from arguments from a professional advocate, could not the Court of Federal Claims reach the same conclusion in its role of resolving a motion for review from the same disappointed petitioner?  And, if it is established that appellate bodies could benefit from the engagement of a professional advocate, could not the finder of fact benefit from this same assistance in the first place?  In other words, does a case have to reach the Circuit Court of Appeals before an amicus can be appointed?

The second difference between DiMasi and Mr. Schulz's case is that the Federal Circuit appointed an "amicus."  An amicus curiae "is a friend of the court, not of the appellant. An *amicus* may support the appellant, preferably by providing a broader perspective than the appellant, who may be solely interested in winning its case." Amoco Oil Co. v. United States, 234 F.3d 1374, 1377 (Fed. Cir. 2000).

In contrast, Mr. Schulz seeks an attorney to represent him.  However, the difference between an attorney representing a petitioner and an attorney acting as an amicus is less than clear because the Federal Circuit ordered the amicus "to support [Ms. DiMasi's] appeal."

Raising these questions is not intended to suggest that special masters have the authority to appoint attorneys.  They are brought forward to demonstrate that a more in-depth discussion might be appropriate in some future case.

Until that future case, those topics can be set aside.  In Mr. Schulz's case, three factors contribute to a denial of his motion for an appointment of counsel. First, as a matter of practicality, the undersigned does not know how an attorney might be appointed.  The Office of Special Masters does not have a roster of attorneys who are waiting for a phone call from a special master.  See Pratcher v. Sec'y of Health & Hum. Servs., No. 19-44V, 2020 WL 5814207, at *5 (Fed. Cl. Spec. Mstr. Aug. 25, 2020).  Second, and relatedly, a list of "vaccine attorneys" is available on the Court of Federal Claims website.  This list is comprised of attorneys who have represented petitioners in the Vaccine Program and who are willing to represent other petitioners.  The attorneys are aware that they are likely to be paid if the case is supported by good faith and reasonable basis.  Mr. Schulz stated in status conferences that he had consulted attorneys, but it is not clear whether this list was used.  Fifteen months after Mr. Schulz filed his petition, he retained an attorney, Sean Greenwood.  See Mot. to Substitute Attorney, filed Mar. 10, 2021.  However, Mr. Greenwood and Mr. Schulz "disagreed about the necessity for certain actions in the case and were not able to resolve their differences," and Mr. Greenwood withdrew three months later on June 2, 2021.  To

the extent that Mr. Schulz has consulted other attorneys, and these attorneys have declined to represent him, their unwillingness may (just may) suggest a problem with Mr. Schulz's claim. Third, Mr. Schulz's case appears to be one in which the assistance of counsel is unlikely to affect the result. The basic chronology of events suggests that the flu vaccine did not harm Mr. Schulz. While the details for that conclusion are explained below, the basic point is that an attorney is not likely to change the result: a denial of compensation.

For these reasons, Mr. Schulz has not demonstrated that his case involves the exceptional circumstances that have justified the appointment of counsel in civil cases. Accordingly, his June 20, 2023 motion is denied.

## ENTITLEMENT TO COMPENSATION

While Mr. Schulz's motion for an appointment of an attorney is, to a degree, a preliminary matter, the essential part of Mr. Schulz's case is a claim that a flu vaccine caused him to suffer transverse myelitis. Whether he is entitled to compensation is taken up next.

## I.    Background: Medical and Procedural History

### A.    Summary of Evidence concerning Events before Litigation

Mr. Schulz was born in 1982. See Pet., filed Dec. 10, 2019, ¶ 3. In 2016, after an injury from ice-skating, Mr. Schulz underwent an operation on his back. Id. ¶ 1; Pet'r's Resp., filed Oct. 4, 2021, at 2. The operation is known as a microdiscectomy.

A second microdiscectomy was also planned. In anticipation of this operation, Mr. Schulz saw an internist, Saima Siddiqui, on October 17, 2016. Dr. Siddiqui prescribed a refill of Mr. Schulz's medication for his lower back pain. Exhibit 6-1 at 1.[4] During this appointment, Mr. Schulz received the allegedly causal flu vaccine. Exhibit 6-1 at 3; Exhibit 7 at 67, Exhibit 10 at 1; see also Pet., ¶

---

[4] Exhibits 6-1 through 6-6 are all contained in a single document, filed as "Exhibit 6" on January 31, 2020. ECF No. 13-7.

4; but see Am Pet., filed Jan. 5, 2023,[5] at Introduction n.1 (questioning actual date of vaccination for unclear reasons).[6]

Mr. Schulz underwent the second microdiscectomy on October 24, 2016. Exhibit 6-2 at 1-9. Derrick Sun, a neurosurgeon, performed the operation. Id.; see also Am. Pet. ¶ 6

To follow up on the surgery, Mr. Schulz visited a family and sports medicine doctor, Rodolfo Navarro, on November 15, 2016. During the appointment, Mr. Schulz complained about a cough. Exhibit 7 at 52-53; see also Pet'r's Resp. filed Oct. 4, 2021, at 2 (Mr. Schulz clarifying that he visited Dr. Navarro for a follow-up, not for the cough). Dr. Navarro's impression was a post-viral cough. Id. at 53. Mr. Schulz also received a refill of his pain medications. Id. at 53-55.

Although not reflected in Dr. Navarro's medical records, Mr. Schulz alleges that before his November 15, 2016 appointment, he had experienced numbness in his tongue after neck flexion as well as a popping and wet sensation in his neck. Pet., ¶ 10, Am. Pet. ¶ 9. In his petition, Mr. Schulz explained that he did not tell Dr. Navarro about the numbness in his tongue because it started after he "look[ed] down to light medically used marijuana in a bong." Pet. ¶ 10. Apparently, Mr. Schulz worried that if the doctor knew he was using marijuana, then Dr. Navarro would not prescribe medication for his pain. See Id.

The next medical record was created on December 3, 2016, when Mr. Schulz went to Texas MedClinic with a chief complaint of a cough and flu-like symptoms. Exhibit 60 at 1-2. He had a fever of 100.8 degrees. Id. at 1. The record noted Mr. Schulz's recent surgery and stated that he developed a cough about one week post-surgery (approximately October 31, 2016) that had not

---

[5] Mr. Schulz filed his Amended Petition as the first pages of his Motion for Miscellaneous Relief on January 5, 2023. See Order, issued Jan. 5, 2023.

[6] The Secretary points out that the medical records showed that Mr. Schulz received two doses of the flu vaccine, both on October 17, 2016. Resp't's Rep., filed Apr. 9, 2021, at 2 n.1; Resp't's Resp. at 4 n.2. The Secretary maintains "the documentation of the receipt of two vaccines on the same date was a clerical error while using a dropdown menu, and petitioner actually received only one flu vaccine on October 17, 2016." Although Mr. Schulz referenced this comment (Pet'r's 2d Reply, filed Aug. 2, 2023, at 2), he seems to accept that he received one dose of the flu vaccine. To the extent the number of doses is disputed, preponderate evidence supports a finding that Mr. Schulz received a single dose.

5

improved.  Mr. Schulz was diagnosed with pneumonia and decided to follow up at the emergency room.  Id.

The same day, Mr. Schulz went to the University Hospital emergency room. Mr. Schulz complained that about two weeks after his surgery (approximately November 7, 2016), he started having a fever and cough.  Exhibit 6-3 at 3.  A rapid test for strep was positive and he was prescribed antibiotics.  Id.; see also Pet. ¶ 11, Am. Pet. ¶ 10-11.

Via a statement submitted during the litigation, Mr. Schulz avers that he told the emergency room doctor, Dr. Tanaka, that the tip of his tongue was numb. Exhibit 34; see also Pet. ¶ 13; Am. Pet. ¶ 11.  Mr. Schulz's wife offered a corresponding statement.  Exhibit 35.  Mr. Schulz, however, recognizes that this complaint does not appear in the emergency room records.  See Pet. ¶ 13 ("Unfortunately, this information was not documented").

Dr. Navarro also assessed Mr. Schulz with strep throat during a December 7, 2016 appointment.  Exhibit 7 at 16.  Dr. Navarro continued the medication for back pain.  Dr. Navarro also supported Mr. Schulz's application for temporary disability benefits.  Id.; see also Pet. ¶ 14, Am. Pet. ¶ 12.

In his petition – but not in his amended petition – Mr. Schulz asserted that between December 2016 and October 2017, he lacked medical insurance.  Pet. ¶ 15.  He stated that after he was approved for disability, a transition from Medicaid to Medicare took ten months.

On January 24, 2017, Mr. Schulz went to his dentist, Edward Elizondo, for a routine evaluation.  Exhibit 4 at 1.  The dentist recommended a return visit to fill cavities.

The next day, Mr. Schulz visited the University Hospital Family Health Clinic.  Exhibit 23 at 194.  His primary reason for the visit was for a refill on his pain medication.  Id.; see also Am. Pet. ¶ 13.  Mr. Schulz also reported that his mouth was numb on the right side, and that he experienced "flu like symptoms after vaccine."  Exhibit 23, EMB UHSRP 2018-2-1 at 194.[7]

On January 30, 2017, Mr. Schulz returned to the dentist to have his cavities filled.  Dr. Elizondo recorded Mr. Schulz's complaint of "NUMBNESS TO

---

[7] Mr. Schulz filed several medical records on a compact disc as Exhibit 23.  This decision follows Mr. Schulz's labeling.

UPPER RIGHT QUAD TO LIP AND TIP OF TONGUE." Dr. Elizondo recommended that he see a neurosurgeon.  Exhibit 4 ("DR. E RECOMMENDS TO SEE A NEUROSURGEON ON THAT"); see also Pet. ¶ 17, Am. Pet ¶ 14.

A report of numbness appears in a medical record created on February 25, 2017.  Exhibit 7 at 8-10.[8]  Mr. Schulz told Dr. Navarro that his mouth was numb and that after a vaccine, he had flu-like symptoms.  Dr. Navarro prescribed medication for his lower back.

As a follow-up to the October 2016 microdiscectomy, Mr. Schulz saw Dr. Sun on February 7, 2017.  Mr. Schulz reported he was functioning much better, although he had constant back pain around the site of the incision.  Exhibit 6-4 at 1; see also Pet. ¶ 6, Am. Pet. ¶ 16.  Mr. Schulz also reported that after he started using a bong, he developed numbness in his tongue.  Dr. Sun stated that the mouth pain was due to using the bong and would improve when Mr. Schulz stopped using the bong.  Id. at 2.  Mr. Schulz did not participate in physical therapy due to a lack of insurance.  Exhibit 6-4 at 3.

The numbness persisted.  Accordingly, Mr. Schulz sought treatment from the emergency room at Guadalupe Regional Medical Center on March 6, 2017.  Mr. Schulz reported that he "can't feel Tip of fingers +++and palm of right hand."  Exhibit 23, EMBGRMCRP 2018-2-26 at 11; see also Pet. ¶ 20; Am. Pet. ¶ 18.  He also reported neck pain and numbness in the tip of his tongue and right cheek.  Id.  The onset was reported as gradual.  An examination detected altered sensation to light touch and was otherwise normal.  Exhibit 5 at 2-3.  The impression was a neuropathy, and he was referred for a follow-up with a neurologist and an MRI pending insurance approval.  Id. at 3.

An MRI on Mr. Schulz's cervical spine revealed "Abnormal focus of T2/STIR signal" but no other abnormalities. Exhibit 3-16 at 2; see also Pet. ¶ 22, Am. Pet. ¶ 19.

After receiving the results of the MRI, Dr. Sun ordered testing on Mr. Schulz's cerebrospinal fluid.  Exhibit 11 at 23-25.  The results of the lumbar puncture included a slightly positive ANA.  Exhibit 11 at 24-25, Pet. ¶ 23, Am. Pet. ¶ 25-27.

After this workup, Mr. Schulz returned to Dr. Sun on May 9, 2017.  He told Dr. Sun he was having numbness and weakness in "both hands since February

---

[8] Neither the petition nor amended petition cites this record.

2017." Exhibit 6-8 at 583; see also Am. Pet. ¶ 29. Dr. Sun recommended that Mr. Schulz schedule an appointment with a neurologist, Rebecca Romero, and undergo a repeat MRI on his cervical spine. Exhibit 6-8 at 584.

Mr. Schulz saw Dr. Romero on May 18, 2017. Exhibit 6-7 at 27-32; see also Am. Pet. ¶ 31. Mr. Schulz provided a history to Dr. Romero. He told Dr. Romero that he received a flu vaccine on October 21, 2016.[9] In November 2016, he flexed his neck forward and felt a pop with no pain. He had an immediate onset of tingling in the right side of his face as well as tingling in his fingertips. Mr. Schulz's chief complaint was "transverse myelitis," although it is unclear where this diagnosis came from; Dr. Sun (who referred Mr. Schulz to Dr. Romero) did not propose transverse myelitis. See Exhibit 6-8 at 584 (Dr. Sun: "Possible inflammation injured spinal cord. Pt reports he felt a pop to back of his neck, possible rupture of spinal cord blood vessel causing stroke to spinal cord. Pt referred to Neurologist Dr Romero for further eval, r/o Multiple Sclerosis.").

Dr. Romero examined Mr. Schulz and detected decreased sensation in his right face, arm, and leg. Exhibit 6-7 at 31. Dr. Romero's list of possible conditions included: "Multiple Sclerosis, ADEM, post-infectious, infectious, lyme disease, bechet's, nmo, sjogren's syndrome, lupus, and tumor." Id. She recommended bloodwork and a repeat cervical MRI. Id. at 32.[10] Dr. Romero did not propose that Mr. Schulz suffered from transverse myelitis but wrote: "Will send for etiologies of Longitudinally extensive transverse myelitis (LETM) but should the lesion continue to enhance after his July 2017 [MRI] c-spine he should be referred to neuro-oncology for tumor evaluation." Id. at 31.

The lab work showed a normal sedimentation rate and C-reactive protein, a low anti-nuclear antibody level (1:40), and no detection of abnormal levels of anti-AQP4 antibodies. Exhibit 11 at 26-30; see also Am. Pet. ¶ 32, 34. Dr. Romero wrote: "[Mr. Schulz's] labs that were sent looking for etiology of transverse myelitis were normal or negative." Exhibit 23 UHSRP 2018-2-1 at 114.

---

[9] Actually, the date of vaccination was October 17, 2016.

[10] Mr. Schulz criticizes the treatment he received from Dr. Romero. Pet'r's 2d Reply at 2-3. These details are not particularly important as any medical malpractice is not directly compensable through the Vaccine Program.

8

As Dr. Sun recommended and Dr. Romero ordered, the cervical MRI was repeated on June 30, 2017. It was significantly improved. Exhibit 11 at 31; see also Pet. ¶ 24; Am. Pet. ¶ 35.

Due to a lack of insurance, Mr. Schulz did not return to Dr. Romero for several months. Exhibit 6-7 at 263; see also Am. Pet. ¶ 36-37. When Mr. Schulz became eligible for Medicare, he scheduled another appointment with Dr. Romero. Am. Pet. ¶ 38.

The follow-up with Dr. Romero occurred on October 26, 2017, with a chief complaint of cervical transverse myelitis. Exhibit 6-5 at 1. Although Dr. Romero detected sensory deficits, Mr. Schulz had improved overall. Exhibit 23 UHSRP 2018-2-1 at 112-17; see also Am. Pet. ¶ 39. Dr. Romero wrote: "Given the timing of the flu vaccine and URI following surgery and now resolution of MRI c-spine lesions I suspect that the myelitis was post-infectious (URI) or post vaccine however either/or cannot be definitively proven." Id. at 115-116. She did not recommend any further treatment.

Mr. Schulz started seeing a new doctor, internist Henneth Corado Montenegro, on December 11, 2017. Exhibit 3-9 at 2.[11] Mr. Schulz told Dr. Montenegro that his face remained numb and that he had a history of cervical transverse myelitis, which was "First suspected by neurosurgeon May 17 due to abnormal MRI." Id. at 2-3. He also reported he was on disability due to his lower back pain. Mr. Schulz informed Dr. Montenegro that he feared vaccinations after his episode of transverse myelitis.

In 2018 and 2019, Mr. Schulz periodically saw Dr. Montenegro and Dr. Romero. Exhibit 3-13 at 1, Exhibit 13-4 at 2-4, Exhibit 3-15 at 2-3; see also Am. Pet. ¶ 42. Although reviewed, these records do not affect whether Mr. Schulz is entitled to compensation. During this period, another neurologist stated that Mr. Schulz suffered from transverse myelitis, not Guillain-Barré syndrome. Exhibit 9 at 1 (Dr. Benjamin Millar); see also Pet. ¶ 31, Am. Pet. ¶ 44.

### B.    Initiation of Litigation

On Thursday, November 14, 2019, Mr. Schulz mailed material to the Secretary of Health and Human Services and the Department of Justice. Exhibit 17. He did not mail his petition to the Clerk of the United States Court of Federal

---

[11] Exhibits 3-1 through 3-19 are all contained in a single document, filed as "Exhibit 3" on January 31, 2020. ECF No. 13-4.

Claims.  The two executive branch agencies received the material on either November 15 or November 18, 2019.  Exhibit 20 at 13-17.  After a communication from an employee at the Department of Health and Human Services, Mr. Schulz sent his petition to the Clerk, who docketed it on December 10, 2019.

### C.    Continued Medical History

Around the time Mr. Schulz was commencing this litigation, his wife and he returned to Dr. Romero.  Exhibit 3-17 at 1 (Nov. 27, 2019); see also Am. Pet. ¶ 45. A purpose was "to discuss his neurologic symptoms with regards to vaccination and illness."  Exhibit 3-17 at 1.  Dr. Romero obtained a detailed history, which is not entirely consistent with information documented in medical records created around the time the event happened.  Dr. Romero wrote that, in her professional opinion, an infection with strep A caused Mr. Schulz's neurologic problems.  Id. at 2.  However, she also stated that "it is impossible to say whether the TM was secondary to strep infection/ADEM (from strep) or the flu vaccine" as no spinal tap or MRI was done at the time.  Id. at 2-3.  Dr. Romero referred to a paper from 2014 reviewing cases of ADEM and noted the infrequency of vaccine causation, as well as the typical 3-week window for symptom onset, but did not name the article. Id. at 3.

After the November 27, 2019 appointment with Dr. Romero, the medical visits become less frequent.  During the pandemic, Mr. Schulz had telemedicine appointments with two doctors from Johns Hopkins, Olwen Murphy and Carlos Pardo-Villamizar.  After the first appointment, Dr. Murphy noted Mr. Schulz's cervical myelopathic syndrome in late 2016, and stated that "The subacute onset, sensory-predominant presentation, and MRI appearance are consistent with myelitis.  The etiology of the myelitis is uncertain." Exhibit 19-1 at 3-5 (June 3, 2020).  In the second visit, which Mr. Schulz recorded, Dr. Pardo-Villamizar stated that he could not opine on the cause of Mr. Schulz's symptoms.  Exhibit 19-2EMRJH 2020-7-22 AAR (audio recording) at 24:37.

### D.    Events during Litigation

After the petition was docketed, the first task was for Mr. Schulz to submit medical records.  He did so.  See CM-ECF 13.

The Secretary filed a motion to dismiss on the ground that Mr. Schulz submitted his petition after the time allowed in the statute of limitations expired. After briefing, the motion to dismiss was denied.  Unpublished Order, issued Feb. 8, 2021.  The undersigned found, for purposes of ruling on the motion to dismiss,

that on November 15, 2016, Mr. Schulz developed a neurologic problem, tingling in his tongue, and that this date started the running of the statute of limitations. The undersigned further ruled that the Clerk's filing of Mr. Schulz's petition on December 10, 2019 was after the statute of limitations expired. However, Mr. Schulz qualified for equitable tolling. Id. at 3-4, citing Askew v. Sec'y of Health & Human Servs., No. 10-767V, 2012 WL 2061804 (Fed. Cl. Spec. Mstr. May 17, 2012).

After this motion was denied, Attorney Sean Greenwood began to represent Mr. Schulz. See CM-ECF 49 (February 23, 2021). But, a few months later, Mr. Greenwood stopped representing Mr. Schulz. Order Granting Mot. to Withdraw, issued July 7, 2021. Other than for these few months, Mr. Schulz has represented himself.

The Secretary maintained Mr. Schulz was not entitled to compensation. Resp't's Rep., filed April 19, 2021. The basic flaw, according to the Secretary, was that treating doctors did not say the flu vaccination harmed Mr. Schulz. Some treaters said that the flu vaccine did not harm him. Id. at 10. Further, Mr. Schulz had not presented a report from a doctor retained for this litigation. Id. at 10-12. The Secretary outlined the elements needed to show a vaccine was the cause-in-fact of an injury and argued that Mr. Schulz did not establish them. Id.

To facilitate the preparation of reports from experts, the undersigned proposed a set of instructions. Order, issued April 29, 2021. After neither party objected, the proposed instructions became final. Order, issued June 2, 2021.

On July 28, 2021, Mr. Schulz requested authority to issue a subpoena to seek evidence regarding his vaccination. This motion was discussed in a recorded status conference held on July 29, 2021. During this status conference, the parties agreed that Mr. Schulz received one dose of a higher strength flu vaccine. Thus, Mr. Schulz's motion for subpoena was denied as unnecessary. Order, issued July 29, 2021. In addition, Mr. Schulz's obligation to get a report from an expert was discussed. Id. (setting the expert report deadline at September 27, 2021). Mr. Schulz disclosed he had scheduled an appointment with a neurologist. However, it appears that no records from this appointment were ever filed. See Am. Pet. ¶ 46-47 (chronological account of medical history, noting a June 3, 2020 appointment followed by an August 11, 2022 appointment).

Via an informal communication to the undersigned's law clerk, Mr. Schulz disclosed that he was having difficulty finding a doctor to support his claim. To address Mr. Schulz's concerns, a recorded status conference was held on August

11

25, 2021. Mr. Schulz requested and was granted an additional 15 days (until October 12, 2021) to file his expert report, as well as a response to Respondent's Rule 4(c) Report. Order, issued Aug. 25, 2021.

Mr. Schulz requested an award for the cost of retaining a service to help him find an expert witness. Pet'r's Mot., filed Sep. 28, 2021. The Secretary opposed an award of costs on an interim basis because Mr. Schulz had not established the reasonable basis for his petition. Resp't's Supp'l Resp., filed Nov. 12, 2021. Eventually, Mr. Schulz determined that he could afford an expert witness locator by using his tax refund. See Decision, issued Jan. 27, 2022.

Mr. Schulz responded to the Secretary's report on October 4, 2021.[12] Mr. Schulz's response to the Respondent's Report relied, in part, on various medical articles Mr. Schulz had come upon while researching his case. See Exhibits 39-58.

Another recorded status conference was held on January 25, 2022. Mr. Schulz's wife, Yvonne Schulz, also participated. One topic was whether Mr. Schulz reported numbness in his tongue on December 3, 2016, when he was seen by Dr. Tanaka in the emergency room. Mr. Schulz also asserted that in his opinion, he suffered from Guillain-Barré syndrome, not transverse myelitis. Mr. Schulz was directed to submit a status report regarding his search for an expert by April 1, 2022. Order, issued Jan. 26, 2022. Mr. Schulz continued to have trouble finding an expert and was given additional time to provide another update on his progress. See Pet'r's Status Rep., filed April 1, 2022; Order, issued April 6, 2022. On May 9, 2022, Mr. Schulz requested an additional 113 days (until August 26, 2022) to file an expert report, stating that he had an appointment with a neurologist, Peter Tarbox, scheduled for August. Mr. Schulz was granted the additional time and was encouraged to make a strong effort to submit an expert report by the deadline. Order, issued May 13, 2022.

### E.     Consultation with Dr. Tarbox

Mr. Schulz had an appointment with Dr. Tarbox at Neurology Consultants of San Antonio on August 11, 2022. Exhibit 72 (filed Aug. 25, 2022). Dr. Tarbox recorded Mr. Schulz's medical history, as relayed to him by Mr. Schulz. Id. Mr. Schulz also provided him with records from his cervical spine MRI. Id. Dr. Tarbox wrote that Mr. Schulz's transverse myelitis was "most likely secondary to

---

[12] Mr. Schulz initially responded on September 29, 2021. He filed a motion to amend/correct his response on October 4, 2021. This motion was granted. Order, issued Oct. 29, 2021.

the flu shot."  Given that this statement arose in the context of Mr. Schulz's own account of his medical history, and that the basis for this conclusion is not provided, it appears that this is Mr. Schulz's opinion as conveyed to Dr. Tarbox, rather than Dr. Tarbox's attribution of causation.  Id.; see Solak v. Sec'y of Health & Hum. Servs., No. 14-869V, 2020 WL 9173158 (Fed. Cl. Spec. Mstr. Feb. 19, 2020) (declining to credit a treater's recitation of an allergic reaction when the information came from the patient).  Mr. Schulz requested Dr. Tarbox's assistance in pursuing his claim, including a claim "that he was misdiagnosed and actually had Guillain-Barre."  Dr. Tarbox declined, did not perform a neurologic exam, and returned Mr. Schulz's co-pay.  Dr. Tarbox also advised Mr. Schulz that he saw "no evidence of Guillain-Barre based on the review of the paperwork," and that Dr. Tarbox "suspect[ed] it may be transverse myelitis."  Id.

### F.  Consultation with Eric Brahin

Based upon an August 11, 2022 referral, Mr. Schulz had an appointment scheduled with Eric Brahin on January 16, 2023.  Exhibit 83 at 2-12.  However, Dr. Brahin did not examine Mr. Schulz.  He declined to participate in a legal matter.  See Pet'r's Status Rep., filed on disc Feb. 21, 2023.

### G.  Continued Litigation until Initial Decision

Another digitally recorded status conference was held on September 28, 2022.  Mr. Schulz stated he had attempted to retain an expert and had spoken with attorneys.  However, he had not been successful in retaining either an expert or a lawyer.  The undersigned recognized Mr. Schulz's diligence but advised that Mr. Schulz's continued lack of success may suggest problems with his underlying case. Mr. Schulz requested and was granted additional time.

Without obtaining support from an expert, Mr. Schulz sought a ruling in his favor.  Pet'r's Mot. for a Ruling in Favor of Entitlement, filed Jan. 5, 2023. Further briefing occurred in response to this motion as described in this opinion.

On November 29, 2023, Mr. Schulz filed a status report stating that he had reached out to an attorney, who declined representation.  He also emailed Dr. Lawrence Steinman, who frequently works as an expert in the Vaccine Program, requesting an expert report or assistance in understanding the BLAST program.  To date, there has been no indication that Dr. Steinman responded to Mr. Schulz.[13]

---

[13] Between December 6, 2023 and February 26, 2024, Mr. Schulz filed five status reports and various exhibits related to an incident at The University of Texas at San Antonio (UTSA) on

Mr. Schulz was found not entitled to compensation.  Decision, issued Mar. 12, 2024.  He had not established the elements for a causation-in-fact claim.  However, Mr. Schulz sought reconsideration.  Pet'r's Mot., filed Mar. 18, 2024.  Mr. Schulz stated that approximately two weeks before the Entitlement Decision, he had corresponded with an attorney who might potentially represent him.  Mr. Schulz anticipated that retaining an attorney would be a step to obtaining a report from an expert witness.  Thus, the March 12, 2024 Decision was withdrawn.  Order, issued Mar. 21, 2024.

### H.    Litigation after Motion for Reconsideration

Mr. Schulz communicated that the lawyer whom he had consulted declined to represent him.  Pet'r's Status Rep., filed Aug. 2, 2024.  Thus, Mr. Schulz has continued to represent as he has throughout the pendency of this litigation, except for the few months (March – July 2021) in which Mr. Greenwood represented him.

As a pro se litigant, Mr. Schulz has continued to file exhibits.  For example, he submitted a series of documents associated with efforts to obtain an expert report from Adetoun Abisogun Musa, a doctor who treated him in 2024.  Exhibits

---

November 30 and December 1, 2023.  Mr. Schulz sought assistance with the BLAST program from the UTSA Molecular Microbiology and Immunology department on November 30.  The employees were uncomfortable with Mr. Schulz's presence and reported him as a suspicious person to campus police that day, as well as upon his return the next day.  Police responded to the scene and determined that Mr. Schulz was not a threat.  Pet'r's Status Rep. and Affidavit, filed Dec. 6, 2023.  Since then, Mr. Schulz has made numerous requests to UTSA's Open Records department for the reports and videos related to the complaints made against him.  Pet'r's Status Rep., filed Dec. 27, 2023; Jan. 8, 2024; and Jan. 31, 2024.  Certain materials were provided, whereas others were withheld or redacted.  Id.; Pet'r's Status Rep., filed Feb. 26, 2024.  Mr. Schulz continues to seek full access to the requested materials and has filed a disability discrimination complaint with UTSA's Equal Opportunity Service and Title IX Office, and a complaint with the Texas Attorney General.  Pet'r's Status Rep., filed Feb. 26, 2024.

Mr. Schulz alleges "that the withholding of information and the handling of his inquiries and requests by UTSA and UT System showcase a pervasive institutional bias" which "hinder[s] Petitioner's access to pivotal information for his case, indicating a prejudicial stance that undermines the principles of transparency and fairness."  Id.  Mr. Schulz further asserts that "The cumulative nature of these actions, marked by a disregard for ethical standards and legal obligations, necessitates a reassessment of the case and the imposition of appropriate corrective measures to address these severe branches of conduct."  Id.  It is not clear whether Mr. Schulz is requesting some form of relief; regardless, any such "corrective measures" would be outside of the scope of the Vaccine Program.

147-56.[14]  Another set of documents concerns efforts to obtain certification of medical records.  Exhibits 157-61.  Of these more recently filed exhibits, the most important is Dr. Musa's report, filed September 25, 2024, which is discussed below.

Two days later, on September 27, 2024, Mr. Schulz submitted a "Status Report Regarding University Health's Certified Medical Records & Motion for Subpoena Duces Tecum," relaying his attempts to obtain certified medical records from Bexar County Hospital District (doing business as University Health) and expressing that he was being "denied access to complete and accurate vaccination and billing records."  Although University Health provided Mr. Schulz with a set of records, a staff member had edited the certification form that Mr. Schulz sent to University Health.  Mr. Schulz requested that a subpoena be issued to compel Universal Health to produce a comprehensive and certified set of his medical records, listing certain "essential documents" to be included.

Mr. Schulz then filed another status report on October 7, 2024, titled "Status Report Regarding Interactions with Dr. Karla Avila and iMED Healthcare Associates."  Mr. Schulz requested and received records from the Methodist Hospital pertaining to his former primary care physician at iMED and from his September 13, 2022 ER visit. He then provided a "Request for Amendment & Complaint of Dr. Avila" to the Methodist legal department and to Dr. Avila's office manager.  Dr. Avila's office denied the request, stating that the "information is accurate as documented."  Mr. Schulz "maintain[ed] that the medical records in question contain significant inaccuracies and misrepresentations," and contended that he has grounds for claims of libel defamation, medical negligence, breach of fiduciary duty, intentional infliction of emotional distress, and violation of ethical guidelines.  Mr. Schulz requested that the status report serve as his formal complain to the Secretary and asked that "the court take any additional action as deemed necessary, to include the appointment of counsel, ensuring Petitioner's due process rights are preserved."  The Secretary was ordered to file a status report stating whether Mr. Schulz's status report could serve as a formal complaint. Order, issued Oct. 10, 2024.  The Secretary advised that a HIPAA-related complaint should be filed by other means.  Resp't's Status Rep., filed Nov. 12, 2024.

---

[14] The communications between a party and the expert retained by the party are not typically disclosed.

Mr. Schulz then contacted a radiologist, Dr. Sunil Kini, about writing an expert report.  Pet'r's Status Rep., filed Dec. 23, 2024.  He provided Dr. Kini with several MRI images to review.  Pet'r's Status Rep., filed Jan. 10, 2025.  Mr. Schulz was given a deadline of February 18, 2025 to state whether he would file a report from Dr. Kini.  Order, issued Jan. 17, 2025. Mr. Schulz requested an additional 30 days to file the status report, as he had an MRI scheduled for March 3, 2025, and wanted to have Dr. Kini review the image.  Pet'r's Status Rep., filed Feb. 11, 2025.  The motion was granted, and Mr. Schulz was given until March 18, 2025 to state whether he would be filing a report from Dr. Kini.  If Dr. Kini agreed to write a report, the report would be due 30 days after Mr. Schulz filed his status report.  Order, issued Feb. 14, 2025.

On March 18, 2025, Mr. Schulz confirmed that he retained Dr. Kini to write an expert report. The deadline for the expert report was therefore set as April 18, 2025.  Order, issued March 26, 2025.  On April 17, Mr. Schulz requested a 15-day extension after realizing that certain imaging records were missing from the files he shared with Dr. Kini.  The motion was granted.  Order, issued April 21, 2025.

Mr. Schulz submitted Dr. Kini's review of his MRI scans as Exhibit 185 on May 5, 2025.  The following day, Mr. Schulz moved for additional time to file Dr. Kini's analysis based upon Exhibit 185.  The motion was granted, and Mr. Schulz submitted Dr. Kini's "Expert Witness Interrogatories & Radiological Findings" as Exhibit 186 on May 12, 2025.  The format is unconventional for an expert report.  There is a series of 17 questions posed by Mr. Schulz, accompanied by Dr. Kini's answers.  The report concludes with a page summarizing Dr. Kini's radiological filings.  He states: "Given the imaging findings and clinical circumstances, it's entirely reasonable to surmise that the vaccine played a critical role in the development of a demyelinating syndrome, possibly MS or the closely related NMO."  Exhibit 186 at 6.

The Secretary requested a status conference to discuss next steps.  Order, issued May 21, 2025.  A recorded status conference was held on May 29, 2025.  The following day, Mr. Schulz filed a motion for interim costs to reimburse Dr. Kini.  The Secretary opposed the motion, arguing that Mr. Schulz's claim lacked reasonable basis.  Resp't's Resp., filed June 13, 2025, at 4.  The Secretary further questioned Dr. Kini's qualifications to opine on immunology and clinical neurology and contended that his opinion regarding the vaccine's possible role in Mr. Schulz's condition was "completely unsupported and cannot qualify as more than a scintilla of objective evidence for purposes of establishing reasonable basis." Id. at 5-6.  The Secretary also argued that, even if reasonable basis was

16

established, the requested rate and the hours spent on the expert report were excessive.  Id. at 7-9.

Mr. Schulz twice moved for and was twice granted additional time to reply to the Secretary's opposition.  See Orders, issued June 23, 2025 and July 15, 2025.  Mr. Schulz then filed a "Notice of Withdrawal of Designation of Expert Witness" on July 18, 2025, stating that the agreement between he and Dr. Kini had been terminated.  On July 23, 2025, Mr. Schulz filed a motion to amend Dr. Kini's invoice.  Along with this motion, Mr. Schulz filed several exhibits, consisting in large part of emails between Mr. Schulz and Dr. Kini throughout the drafting process and culminating in the rupture of their professional relationship.  In his motion, Mr. Schulz stated:

> Petitioner no longer believes any substantial portion of Dr. Kini's fees are warranted, nor does he believe any portion of Dr. Kini's studies, report or communications should be used when determining the substantive nature of his VICP claim.  In the same breath, Petitioner believes reasonable basis still exists and will discuss the above aspects accordingly in his upcoming response for interim fees request.

Pet'r's Mot. to Amend, filed July 23, 2025, at 2.[15]

The Secretary filed an amended response on August 12, 2025, maintaining that Mr. Schulz's claim lacked reasonable basis.  Mr. Schulz's reply, which has a deadline of September 5, 2025, has not yet been filed; however, the outstanding motion for interim costs has no bearing on the outcome of this case.

## II.    Standards for Adjudication

A petitioner is required to establish his case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations

---

[15] Given that Mr. Schulz stated that he believes that no portion "Dr. Kini's studies, report or communications should be used when determining the substantive nature of his VICP claim," Dr. Kini's report is not further discussed in this decision.

omitted).  Proof of medical certainty is not required.  Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high.  Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

For off-Table injuries, petitioners bear a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury."  Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

## III.   Analysis

The three elements from Althen are discussed below.  The analysis begins with timing because that is the most important.

### A.   *Althen* Prong Three – Timing

The timing prong actually contains two parts.  A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period.  Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013).  With respect to timing, Mr. Schulz's case falters because he has not demonstrated that he experienced a manifestation of transverse myelitis within the appropriate time.

Appropriate Interval.  The parties dispute the interval for which an inference of causation is appropriate.  Mr. Schulz argues that a latency of up to 60 days is an appropriate one in which flu vaccine might cause transverse myelitis.  Pet'r's Mot. at 10 ¶ 55; see also Pet'r's Reply at 2, 5 (citing Doe 93 v. Sec'y of Health & Hum. Servs., 98 Fed. Cl. 553 (2011)).  The Secretary contends that Mr. Schulz has not submitted an expert report, and the medical records do not address the issue of timing.  Resp't's Resp. at 15-16.

18

The Secretary's point regarding the lack of evidence is well taken.  Parties, including pro se petitioners, should prove their cases based upon evidence.  See Althen, 418 F.3d at 1281 (a "special master's role is to assist the courts by judging the merits of individual claims on a case-by-case basis").  Nevertheless, special masters may rely on their general experience.  Whitecotton v. Sec'y of Health & Hum. Servs., 81 F.3d 1099, 1104 (Fed. Cir. 1996).  Here, other adjudications found that an appropriate onset may extend to approximately six weeks.  Halm v. Sec'y of Health & Hum. Servs., No. 17-338V, 2017 WL 7513285, at *1 (Fed. Cl. Spec. Mstr. Dec. 19, 2017).  Thus, Mr. Schulz's contention of 60 days does not appear frivolous.  Resolving whether 60 days is an appropriate amount of time is not necessary because even if 60 days were accepted, Mr. Schulz would still not be entitled to compensation.

Onset of Transverse Myelitis. Mr. Schulz's evidence regarding timing falters for lack of persuasive proof about when his transverse myelitis began.  It is important to emphasize that the development of a problem may or may not be a manifestation of a disease.  See Rocha v. Sec'y of Health & Hum. Servs., No. 16-241V, 2024 WL 752787, at *33 (Fed. Cl. Spec. Mstr. Feb. 1, 2024) (stating "As a matter of logic, a doctor's detection of a disease does not establish the date the disease began" and citing appellate cases affirming findings regarding date of onset).

Mr. Schulz argues that he had numbness in his tongue by November 15, 2016.[16]  He further argues he reported this problem to Dr. Tanaka on December 3, 2016.  Am. Pet. ¶¶ 9-11.

The Secretary contests this assertion.  The Secretary comments that the emergency room records do not document a report of tongue numbness.  Resp't's Resp. at 16 (citing Exhibit 6-2 at 3-5).  The Secretary seems to suggest that Mr. Schulz's numbness started around January 25, 2017 when he reported this problem to Dr. Navarro.  Id. (citing Exhibit 7 at 8-10).  This was the day after Mr. Schulz reported numbness to his dentist, Dr. Elizondo.  Exhibit 4.  An onset in late January is roughly similar to a March 6, 2017 report in which Mr. Schulz said his facial numbness began about one month earlier.  Exhibit 23, EMBGRMCRP 2018-2-26 at 11.

---

[16] Sometimes, medical records referred to facial numbness.  And sometimes the word tingling is used instead of numbness.  See Pet'r's 2d Reply at 3.  This opinion uses "tongue numbness" as a shorthand expression to capture all of the above concepts.

Determining as a matter of fact when the tongue numbness began is not necessary. It is sufficient to note that Mr. Schulz's claim seems plausible, but not likely. If a finding were required, additional evidence, such as oral testimony, would be pursued.

An adjudication of when time numbness began is not required because Mr. Schulz has not established that his tongue numbness was part of transverse myelitis. No doctor has diagnosed isolated tongue numbness as a symptom of transverse myelitis. When Dr. Navarro learned about tongue numbness, Dr. Navarro prescribed medication for Mr. Schulz's lower back. Exhibit 7 at 8-10. Mr. Schulz, in effect, is requesting that a special master diagnose him as suffering from transverse myelitis in November 2016, but special masters do not diagnose. Knudsen v. Sec'y of Health & Hum. Servs., 35 F.3d 543, 549 (Fed. Cir. 1994). Moreover, at least two other factors complicate any analysis of tongue numbness as a manifestation of transverse myelitis. First, the March 20, 2017 MRI showed lesions at C2-C3. See Exhibit 3-16 at 2; Exhibit 11 at 31. Mr. Schulz has not established that lesions in his neck would cause problems in his tongue. Second, Dr. Sun provided an alternative explanation for Mr. Schulz's tongue numbness – Mr. Schulz's sucking on a bong. Exhibit 6-4 at 2. Thus, even if it is assumed that Mr. Schulz had tongue numbness on November 15, 2022, it is not a given that the tongue numbness was due to transverse myelitis. To be entitled to compensation, Mr. Schulz was required to present more evidence.[17]

The foregoing analysis was contained in the (withdrawn) March 12, 2024 decision. The disclosure of this reasoning alerted Mr. Schulz to a problem. However, in the intervening time—approximately 18 months—he has not corrected it. For example, Dr. Musa did not opine that one manifestation of transverse myelitis was tongue numbness. See Exhibit 150.

Mr. Schulz has not persuasively linked the transverse myelitis which he proposed in May 2017 to a symptom in November 2016. Thus Mr. Schulz's proof on Althen prong three fails. This lack of evidence means Mr. Schulz cannot receive compensation. Therefore, an assessment of the remaining prongs can be more cursory.

---

[17] The current procedural posture – a ruling on the record after all evidence has been submitted – distinguishes the present opinion from the February 8, 2021 Order, denying the motion to dismiss. At the motion for dismiss stage, well-pleaded allegations are accepted as accurate. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

## B.    Althen Prong One – Theory

Mr. Schulz bears the burden to present a medical theory causally connecting the vaccination and the injury.  Here, he argues he has met his burden because of another special master's ruling in Askew.  Pet'r's Mot. at 8-10, Pet'r's Reply at 2-4.  Although the Secretary did little to rebut Askew, the Secretary maintained that Mr. Schulz did not satisfy Althen prong 1.  Resp't's Resp. at 13-14.

Mr. Schulz overstates the value of Askew.  Special masters are not required to reach the same outcome.  See Trollinger v. Sec'y of Health & Hum. Servs., 167 Fed. Cl. 127, 140-41 (2023) (stating a special master did not commit legal error by rejecting a theory four other special masters had accepted).  Moreover, special masters have not universally agreed that the flu vaccine can cause transverse myelitis.  See, e.g., Pearson v. Sec'y of Health & Hum. Servs., No. 16-9V, 2019 WL 3852633 (Fed. Cl. Spec. Mstr. July 31, 2019); Bowling v. Sec'y of Health & Hum. Servs., No. 18-109V, 2023 WL 6846491 (Fed. Cl. Spec. Mstr. Sept. 20, 2023).  While Askew might offer some support to an argument regarding prong one, Askew cannot replace the need for evidence in the first place.

When the evidence in Mr. Schulz's case is examined, the evidence falls short.  Mr. Schulz has not met his burden to present "a medical theory causally connecting the vaccination and the injury."  Althen, 418 F.3d at 1278.  Thus, he does not meet prong one.

Again, the March 12, 2024 withdrawn decision contained the foregoing analysis.  Mr. Schulz, arguably, may have slightly improved his case by filing the report from Dr. Musa.  But, Dr. Musa's report has limited utility.  She concludes her report by writing: "Given the timing, clinical presentation, and MRI findings, it is reasonable to consider that Mr. Schulz's symptoms may be linked to a vaccine-induced immune response."  This phrasing "may be linked" does not fulfill a petitioner's obligation to present causation opinions in terms of more-likely-than-not.  See Paterek v. Sec'y of Health & Hum. Servs., 527 F.App'x 875, 883 (Fed. Cir. 2013) (statement that causation is "not impossible" does not support causation at all); Nieves v. Sec'y of Health & Hum. Servs., 167 Fed. Cl. 422, 429 (2023) (a statement of "possible" did not have to be credited as supporting causation); Austin v. Sec'y of Health & Hum. Servs., 141 Fed. Cl. 268, 280 (2018) (a statement of "possible" did not support causation), aff'd, 818 Fed. Appx. 1005 (Fed. Cir. 2020); Frescano v. Sec'y of Health & Hum. Servs., 99 Fed. Cl. 28, 34 (2011) (a statement of "suspicion" is not preponderant evidence); Horn v. Sec'y of Health & Hum. Servs., 19 Cl. Ct. 439, 450 (1990) (a statement of "highly possible" is not preponderant evidence).  Although Mr. Schulz attempted to reinforce Dr. Musa's

21

report (see exhibits 151-55), Dr. Musa's report is Dr. Musa's report.  Dr. Musa was, apparently, only willing to go so far as she was going to go and where she went did not carry Mr. Schulz's burden on Althen prong one.

###   C.      Althen Prong Two – Logical Sequence

The remaining Althen prong requires a logical sequence of cause and effect showing that the vaccination was the reason for the injury.  "The second prong of the Althen III test is not without meaning."  Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1327 (Fed. Cir. 2006).  With respect to this prong, the Federal Circuit has instructed special masters to consider carefully the views of a treating doctor.  Id. at 1326.

Here, Mr. Schulz's evidence is again lacking.  Without a report from a retained expert, Mr. Schulz is relying upon statements from treaters.  See 42 U.S.C. § 300aa–13(a).  However, statements presenting a sequence of events must be distinguished from statements of causation.  See Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d 1328, 1347–48 (2010); La Londe v. Sec'y of Health & Hum. Servs., 110 Fed. Cl. 184, 206 (2013), aff'd on other ground, 746 F.3d 1334 (Fed. Cir. 2014); Langland v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 421, 439 (2013) (stating that the special master was not arbitrary in finding that the records from treating doctors "reflect no more than intake histories or temporal associations"); Caves v. Sec'y of Health & Hum. Servs., 100 Fed. Cl. 119, 139–40 (2010), aff'd without opinion, 463 Fed. App'x 932 (Fed. Cir. 2012).

In response to the motion for ruling on the record, the Secretary argued that the treaters have not implicated the flu vaccine as a cause for transverse myelitis. See Resp't's Resp. at 13-14.  Some treating doctors pointed to other causes or were equivocal.  See Exhibit 3-17 at 2-3 (Dr. Romero: "it is impossible to say whether the TM was secondary to [a strep A infection] or the flu vaccine"), Exhibit 6-4 at 2 (Dr. Sun - bong use), Exhibit 19-2EMRJH 2020-7-22 AAR (audio recording) at 24:37 (Dr. Pardo-Villamizar stating that he could not opine on the cause of Mr. Schulz's symptoms).

The additional evidence from Dr. Musa does not change the analysis.  She, too, did not assert that the flu vaccine probably caused Mr. Schulz to suffer transverse myelitis.  See Exhibit 155.  Therefore, the evidence, when considered as a whole, does not preponderate in favor of finding a logical sequence of cause and effect.

## IV.    Additional Matters / Comments

The case was comprehensively reviewed in March 2024.  Then, the evidence did not preponderate in Mr. Schulz's favor.  However, in light of Mr. Schulz's pro se status, the March 13, 2024 decision was withdrawn with the expectation that Mr. Schulz would soon obtain counsel, and counsel would assist him in procuring a report from an expert.  Mr. Schulz's efforts to engage an attorney did not succeed.

The lack of representation does not affect the outcome of Mr. Schulz's case because the outcome depends upon the evidence.  After the March 13, 2024 decision, Mr. Schulz has added some new evidence, such as Dr. Musa's report.  But this report does not constitute persuasive proof that the flu vaccination caused Mr. Schulz to suffer transverse myelitis.

Continuing this case would not be in the interest of justice.  The case has been pending for approximately six years.  Mr. Schulz has attempted to engage attorneys many times and the only attorney who agreed to represent Mr. Schulz (Mr. Greenwood) withdrew quickly.  Mr. Schulz has attempted to obtain reports from at least two doctors who were treating him, Dr. Tarbox and Dr. Musa.  However, each doctor ended the doctor-patient relationship.  After obtaining a report from a radiologist, Dr. Kini, that relationship was also terminated, and Mr. Schulz now disavows Dr. Kini's report.  Under these circumstances, searching for another doctor to opine on Mr. Schulz's claim that a vaccination administered in 2016 harmed him seems impractical.

Mr. Schulz has sought authority to issue subpoenas.  Pet'r's Mot., filed Sep. 27, 2024.  This motion is DENIED.  The additional evidence potentially contained in the records from University Health is highly unlikely to change the outcome.  The outcome, as explained above, is based upon a lack of connection between tongue numbness and transverse myelitis, a lack of a theory explaining how the flu vaccine can cause transverse myelitis, and the lack of support from treating doctors.  Mr. Schulz has not persuasively argued that treatment records are likely to fill any gaps in his case.

## V.    Summary

Mr. Schulz has represented himself since November 2019.  To his credit, he has advocated respectfully and courteously during various status conferences.  He has also attempted to comply with various orders.  However, through no fault of his own, Mr. Schulz has not been able to gather evidence to support his claim that

an October 17, 2016 flu vaccine caused him to develop transverse myelitis.  Due to the lack of preponderant evidence, Mr. Schulz is not entitled to compensation.  Mr. Schulz has also not shown that extraordinary circumstances warrant an assignment of counsel to represent him.

The Clerk's Office is instructed to enter judgment in accordance with this decision unless a motion for review is filed.  Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, available through the Court's website.

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master