# In the United States Court of Federal Claims

No. 19-1863
Filed: February 25, 2026
Reissued: April 23, 2026[1]

|  |  |
|---|---|
| JOSHUA SCHULZ, | ) ) ) |
| *Petitioner*, | ) ) |
| v. | ) ) |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | ) ) ) |
| *Respondent*. | ) ) ) |

*Joshua Schulz*, appearing *pro se*, Petitioner.

*Lauren Kells*, Trial Attorney, Vaccine/Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for Respondent.

## OPINION AND ORDER

In his petition, Joshua Schulz contends an influenza vaccination caused him to develop transverse myelitis.  The Special Master, however, found that Mr. Schulz failed to meet his burden under all three *Althen* prongs necessary for his off table claim to prevail.  Mr. Schulz failed to (1) causally connect his vaccination to transverse myelitis, (2) supply expert reports or other evidence showing a logical sequence of cause and effect, and (3) demonstrate that transverse myelitis manifested within the applicable time frame.

Because the Special Master considered and reasonably weighed the evidence under the applicable legal framework and provided thorough explanations for his denial of Mr. Schulz's claims, the Special Master's conclusions are neither arbitrary nor capricious.  Thus, the court sustains the Special Master's decision and denies Mr. Schulz's motion for review.

---

[1] In accordance with Vaccine Rule 18(b), the court allowed each party fourteen days in which to move to redact portions of this Opinion and Order.  The court allowed some extra time given that Plaintiff is proceeding pro se and is receiving orders through the U.S. Mail.  Because the court did not receive any proposed redactions, the court reissues this decision publicly.

## I.    Background

### A.    Factual Background

1.    <u>2016</u>

Mr. Schulz received an influenza vaccine on October 17, 2016, during an appointment with internal medicine physician Dr. Saima Siddiqui.[2] Exs. 6-1 at 3, 7 at 67, 10 at 1.[3] This appointment was ahead of Mr. Schulz's second microdiscectomy for his lower back pain, which was performed a week later. Exs. 6-1 at 1, 6-2 at 1–9. Mr. Schulz followed up post-procedure with Dr. Rodolfo Navarro, a family and sports medicine physician. Ex. 7 at 52–53. At this November 15, 2016, appointment, Mr. Schulz complained of a cough, which Dr. Navarro labelled as a "likely post-viral cough." Pet. ¶ 10;[4] Ex. 7 at 53. Both Dr. Siddiqui and Dr. Navarro refilled Mr. Schulz's pain medications for his back pain. Exs. 6-1 at 1, 7 at 53–55.

Mr. Schulz also alleges that, around this same time, he had "begun experiencing a tingling sensation in his tongue" that "first presented itself after looking down to light medically used marijuana in a bong." Pet. ¶ 10; Am. Pet. ¶ 9. Mr. Schulz claims he did not inform Dr. Navarro of this issue given concerns that "he may not be prescribed pain medication due to marijuana use." Pet. ¶ 10.

Mr. Schulz's cough did not improve. On December 3, 2016, Mr. Schulz went to Texas MedClinic with flu-like symptoms, including the cough (recorded as developing one-week post-surgery) and a fever of 100.8 degrees. Ex. 60 at 1–2. Mr. Schulz was diagnosed with pneumonia. *Id*. at 1. Later that day, he went to University Hospital's emergency room, where he tested positive for strep A and was prescribed antibiotics. Ex. 6-3 at 3; Pet. ¶ 11; Am. Pet. ¶¶ 10–11. During his emergency room visit, he again complained of a fever and cough, claiming they began two weeks after his microdiscectomy. Ex. 6-3 at 3. Mr. Schulz and his wife contend they informed the emergency room physician that the tip of his tongue was also numb at the

---

[2] While there has been ambiguity surrounding whether Mr. Schulz received one or two doses of the vaccine, the Special Master determined that "preponderant evidence supports a finding that Mr. Schulz received a single dose." ECF No. 233 at 4–5 n. 5. In his motion for review, Mr. Schulz contends this means he received a "higher than normal dosage . . . regardless of whether it was administered in one or multiple doses." ECF No. 254 at 10. As the Parties agree that Mr. Schulz received a higher strength vaccine, ECF No. 233 at 11, and do not further dispute this issue, the court does not address this point.

[3] Because the Parties' exhibits span multiple CM/ECF entries, the court cites the Parties' exhibit numbers rather than their CM/ECF numbers. The court also cites to the Petitioner's petition, ECF No. 1, and Petitioner's amended petition, ECF No. 117. Any exhibits received via a compact disc that do not appear directly on the docket are noted with the style of longform citation used in Special Master Moran's August 28, 2025, decision, ECF No. 233.

[4] In his decision, the Special Master cites both the petition, ECF No. 1, and the amended petition, ECF No. 117. As Mr. Schulz intended for ECF No. 117 "to amend/supplement his original petition," *id*. at 10, and neither Party objects to the Special Master's references to both, the court also cites to original and amended petitions.

time.  Ex. 34; Pet. ¶ 13; Am. Pet. ¶ 11.  This claim, however, was not documented.  *See* ECF No. 233 at 6; Pet. ¶ 13.

Dr. Navarro examined Mr. Schulz a few days later and continued Mr. Schulz's back pain medication.  Dr. Navarro also agreed to support Mr. Schulz's temporary disability benefits application.  Ex. 7 at 16; Pet. ¶ 14; Am. Pet. ¶ 12.

### 2.    2017

On January 25, 2017, Mr. Schulz sought a refill of his back pain medication during a visit to the University Hospital Family Health Clinic.  Ex. 23, EMB UHSRP 2018-2-1 at 194.  At the time, he mentioned numbness on the right side of his mouth and again reported flu-like symptoms, which he attributed to the flu vaccine.  Ex. 7 at 8–10; Ex. 23, EMB UHSRP 2018-2-1 at 194.  The visit took place the day after a routine visit to the dentist.  Ex. 4.  The next week, Mr. Schulz returned to have Dr. Edward Elizondo, his dentist, fill cavities spotted during the routine visit.  During this visit, Mr. Schulz complained of lip and tongue numbness.  *Id*.; Pet. ¶ 17; Am. Pet. ¶ 14.  Dr. Elizondo consequently recommended seeing a neurosurgeon.  Ex. 4.

On February 7, 2017, Mr. Schulz had a follow-up with his neurosurgeon, Dr. Derrick Sun, who performed the second microdiscectomy.  Ex. 6-4 at 1; Pet. ¶ 6; Am. Pet. ¶ 16.  During this visit, Mr. Schulz expressed improvement in his condition, although he still had pain localized to the incision site and its surrounding area.  *Id*.  The notes from the visit included the following regarding tongue and lip numbness:

> [Patient] reported numbness sensation to tip of tongue and skin above [right] top lip starting around right corner of mouth to center of lip.  [Patient] states he started experiencing [symptoms] after use of his bong.  Advised [symptoms] are not [secondary] to surgery, likely [secondary] to suction, pressure from use of the bong and should improve over time with cessation of bong.   [Patient] to [follow-up] with [primary care physician] if [symptoms] continue.

Ex. 6-4 at 2 (abbreviations and shorthand expanded).

Mr. Schulz continued to have numbness issues.  A month after his visit with Dr. Sun, he visited the Guadalupe Regional Medical Center's emergency department.  Ex. 23, EMBGRMCRP 2018-2-26 at 11; Pet. ¶ 20; Am. Pet. ¶ 18.  There, he reported a lack of feeling in his fingertips and palm of his right hand, in addition to the continuing numbness in his tongue and right cheek.  Ex. 23, EMBGRMCRP 2018-2-26 at 11.  He also complained of neck pain.  *Id*.  An MRI found an "[a]bnormal focus of T2/STIR signal," and a subsequent lumbar puncture was slightly positive for antinuclear antibodies (ANA).  Exs. 3-16 at 2, 11 at 23–25; Pet. ¶¶ 22, 23; Am. Pet. ¶¶ 19, 25–27.

Mr. Schulz had another appointment with Dr. Sun on May 9, 2017.  Ex. 6-8 at 583; Am. Pet. ¶ 29.  There he complained of weakness and a lack of sensation in both hands that he now says began in February 2017.  Ex. 6-8 at 583.  Considering these complaints and Mr. Schulz's test results, Dr. Sun referred him to neurosurgeon Dr. Rebecca Romero, whom he saw about a week later.  Exs. 6-7 at 27–32, 6-8 at 584; Am. Pet. ¶ 31.  Mr. Schulz recounted his medical

history—including having received a dose of the flu vaccine in 2016—and demonstrated how flexing his neck forward caused a painless popping followed by tingling in his fingertips and on the right side of his face. Exs. 6-7 at 27–32, 6-8 at 584. After evaluating him, Dr. Romero concluded that sensation was lost on his right side, including in his face, arm, and leg. Ex. 6-7 at 31. Dr. Romero recommended another MRI, which showed notable improvement from the prior cervical scan. *Id*. at 32; Ex. 11 at 31; Pet. ¶ 24; Am. Pet. ¶ 35.

During his appointment with Dr. Romero, Mr. Schulz brought up a complaint regarding transverse myelitis.[5] Dr. Sun, who had referred Mr. Schulz to Dr. Romero, did not indicate that transverse myelitis was a potential diagnosis. Ex. 6-8 at 584. Following his visit with Mr. Schulz, Dr. Romero listed the following conditions as potential diagnoses: "Multiple Sclerosis, ADEM, post-infectious, infectious, lyme disease, bechet's, nmo, sjogren's syndrome, lupus, and tumor." Ex. 6-7 at 31. Dr. Romero also recommended bloodwork to look for transverse myelitis markers. *Id*. The labs "sent looking for etiology of transverse myelitis were normal or negative," Ex. 23 UHSRP 2018-2-1 at 114. A follow-up appointment with Dr. Romero recorded overall improvements in Mr. Schulz's condition. Ex. 23 UHSRP 2018-2-1 at 112–117; Am. Pet. ¶ 39. Mr. Schulz, however, again complained of his allegedly diagnosed transverse myelitis, to which Dr. Romero recorded that, "[g]iven the timing of the flu vaccine and URI following surgery and now resolution of MRI c-spine lesions I suspect that the myelitis was post-infectious (URI) or post vaccine however either/or cannot be definitively proven." Ex. 23 UHSRP 2018-2-1 at 115–116.

Mr. Schulz added a new doctor to his medical rotation in December 2017. Ex. 3-9 at 2. Mr. Schulz informed this doctor, Dr. Henneth Cortado Montenegro, that (1) his face still lacked sensation, (2) he had a history of transverse myelitis, (3) he was on disability from lower back pain, and (4) he had a fear of vaccines from the onset of transverse myelitis. *Id*. at 2–3. Dr. Montenegro informed Mr. Schulz that the transverse myelitis was "[f]irst suspected by neurosurgeon May 17 due to abnormal MRI." *Id*. at 3.

      3.     <u>2018–Present</u>[6]

---

[5] Transverse myelitis is a neurological disorder involving "inflammation of both sides of one section of the spinal cord" which "interrupts the messages that the spinal cord nerves send throughout the body." *Transverse Myelitis*, MAYO CLINIC (last visited Feb. 24, 2026), www.mayoclinic.org/diseases-conditions/transverse-myelitis/symptoms-causes/syc-20354726. Transverse myelitis can lead to "pain, muscle weakness, paralysis, sensory problems, or bladder or bowel dysfunction." *Id*.

[6] Mr. Schulz had appointments with Dr. Montenegro and Dr. Romero throughout 2018 and 2019. Exs. 3-9 at 2 at 2–3, 3-13 at 1, 13-4 at 2–4, 3-15 at 2–3; Am. Pet. ¶ 42. Dr. Benjamin Millar, another neurologist, recorded that Mr. Schulz suffered from transverse myelitis, but not Guillain-Barré syndrome, during this same time frame. Ex. 9 at 1; Pet. ¶ 31; Am. Pet. ¶ 44. The Special Master considered these medical records and found them to be irrelevant to the discussion of whether Mr. Schulz was entitled to compensation for a vaccine-related injury. *See* ECF No. 233 at 9.

In November 2019, around the time this litigation began, Mr. Schulz and his wife again visited Dr. Romero "to discuss his neurological symptoms with regards to vaccination and illness." Ex. 3-17 at 1. The medical history discussed does not align with medical records created around the time of each medical visit. *Id*. While Dr. Romero advised that an infection with strep A caused the exhibited neurological issues, she opined that "it is impossible to say whether the [transverse myelitis] was secondary to strep infection/ADEM (from strep) or the flu vaccine." *Id*. at 2–3. Two physicians that met with Mr. Schulz via telehealth visits during the COVID-19 pandemic, Dr. Olwen Murphy and Dr. Carlos Pardo-Villamizar, also could not provide what definitively caused Mr. Schulz's neurological symptoms. *See* Ex. 19-1 at 3–5 ("The etiology of the myelitis is uncertain."); *see also* Ex. 19-2 EMRJH 2020-7-22 AAR (audio recording) at 24:37.

## B.     Procedural History

Mr. Schulz filed his petition for compensation in December 2019, claiming the dose of the flu vaccine he received on October 17, 2016, caused transverse myelitis. *See* ECF No. 1. Over the past six years, this case has delved into questions regarding the statute of limitations, appointment of counsel, reimbursement of fees, and more. The Special Master first denied the Secretary's motion to dismiss for exceeding the statute of limitations on February 8, 2021. ECF No. 47. More motions were filed after the denial of the motion to dismiss, mostly by Mr. Schulz, including motions seeking assistance with locating and paying for expert reports. *See, e.g.*, ECF Nos. 72, 73.

During an August 25, 2021, status conference, Mr. Schulz stated that he was having trouble retaining an expert. *See* ECF No. 70. Despite being awarded more time to find an expert witness after this conference, ECF No. 71, Mr. Schulz continued to have trouble. The Special Master granted extensions until August 26, 2022. ECF Nos. 97, 103.[7] The Special Master extended these deadlines until August 2022 because Mr. Schulz had an appointment scheduled with a neurologist on August 11 and wanted "to allow [for] time to have the findings generated in the form of a report." ECF No. 103. The Special Master also informed Mr. Schulz that, given the lengthy extension, he "should make a strong effort to submit an expert report within the time permitted." *Id*.

### 1.     Consultation with Dr. Tarbox

Mr. Schulz did meet with a neurologist, Dr. Peter Tarbox, on August 11, 2022. Ex. 72. Mr. Schulz told Dr. Tarbox about his medical history and his MRI records. *Id*. at 1. Based on Mr. Schulz's account of his medical issues, Dr. Tarbox concluded that there was "no evidence of Guillain-Barré based on the review of the paperwork" and transverse myelitis was "most likely secondary to the flu shot." *Id*. In his most recent decision, the Special Master held that this

---

[7] At a January 26, 2022, status conference, Mr. Schulz opined that he perhaps suffered not from transverse myelitis, but from Guillain-Barré syndrome. *See* ECF No. 233 at 12; *see also* ECF No. 87. Guillain-Barré syndrome is a neurological condition causing "weakness, numbness or paralysis" due to "the body's immune system attack[ing] the nerves." *Guillain-Barré Syndrome*, MAYO CLINIC (last visited Feb. 24, 2026), https://www.mayoclinic.org/diseases-conditions/guillain-barre-syndrome/symptoms-causes/syc-20362793.

conclusion could not be assigned much weight as it is based solely on information provided by Mr. Schulz.  *See* ECF No. 233 at 12; *see also Solak v. Sec'y of Heath & Hum. Servs.*, No. 14-869V, 2020 WL 9173158 (Fed. Cl. Spec. Mstr. Feb 19, 2020).  Dr. Tarbox declined to assist Mr. Schulz in pursuing his vaccine injury claims, did not perform a neurological exam, and did not charge him the co-payment.  Ex. 72 at 1.[8]

### 2.    Dr. Musa's "Report"

Mr. Schulz continued to have difficulty retaining an expert to assist with his vaccine injury claim.  ECF No. 233 at 13; *see, e.g.*, ECF Nos. 147–61.  He also struggled to retain counsel to represent him in this matter.  *See, e.g.*, ECF No. 177.  Other than a short stint with counsel from March 2021 to July 2021, Mr. Schulz has represented himself pro se.  *Id.*

Mr. Schulz has made several attempts to receive medical records and expert reports over the years.  These efforts include attempts to receive a report from Dr. Adetoun Abisogun Musa, ECF Nos. 147–61; compel medical information from University Health, ECF No. 183; and lodge complaints about Dr. Karla Avila and Methodist Hospital over allegedly inaccurate and defamatory records, ECF Nos. 185, 188, 192.

Mr. Schulz first submitted what he styled as an "export report" by Dr. Musa on September 25, 2024.  ECF No. 180.  Mr. Schulz visited Dr. Musa, a neurologist, on May 30, July 25, and September 10, 2024.  *Id.* at 1–2.  Mr. Schulz provided a three-page doctor's note, titled "Expert Neurological Report: Analysis of Potential Vaccine-Induced Demyelinating Lesions," which chronicles Mr. Schulz's personal account of his medical history, his MRI history, and provides Dr. Musa's conclusions.  Ex. 150.  In synthesizing this document and other drafts from Dr. Musa, Mr. Schulz wrote that, "while providing some valuable insights, [Dr. Musa] fails to adequately address critical aspects of the temporal relationship between the influenza vaccination and the onset of neurological symptoms."  ECF No. 180 at 1.  Dr. Musa's note simply provides that, from a temporal relationship perspective, "[t]he rapid onset of symptoms post-vaccination is consistent with reported cases of vaccine-associated demyelination, supporting a plausible link."  Ex. 150 at 4.  According to Dr. Musa, "[g]iven the timing, clinical presentation, and MRI findings, it is reasonable to consider that Mr. Schulz's symptoms may be linked to a vaccine-induced immune response."  *Id.*

But this "report" came after Dr. Musa withdrew from serving as an expert for Mr. Schulz.  ECF No. 180 at 2.  As Mr. Schulz retells this series of events, Dr. Musa questioned "the need for an attorney" and "additional documentation" before serving as an expert.  *Id.* at 1–2.  Mr. Schulz also sent emails during this time regarding "unauthorized billing" by Dr. Musa.  *Id.* at 2.  Once Dr. Musa sent her findings, Mr. Schulz emailed "regarding proposed changes."  *Id.*  That same day, Dr. Musa called to tell Mr. Schulz that she would no longer serve as an expert and was terminating their doctor-patient relationship.  *Id.* at 2–3.  The Special Master considered this history and concluded that Dr. Musa's findings did not constitute an expert report, but "a series

---

[8] Mr. Schulz was also referred to another doctor, Dr. Eric Brahin, and scheduled an appointment with him for January 16, 2023.  Ex. 83 at 2–12.  Dr. Brahin did not examine Mr. Schulz and declined to assist in pursing this vaccine injury claim.  *Id.*; ECF No. 118 (status report filed via portable storage disc).

of documents associated with efforts to obtain an export report." ECF No. 233 at 14. In the end, the Special Master found this report "has limited utility." *Id*. at 21.

### 3. Dr. Kini's "Report"

Mr. Schulz submitted more documents styled as an expert report on May 21, 2025, and May 29, 2025. ECF Nos. 212, 217. This time, the documents relate to analyses of Mr. Schulz's MRI images by Dr. Sunil Kini, a radiologist that Mr. Schulz communicated with in December 2024. *Id*.; ECF No. 196. After much back and forth with the court, Mr. Schulz confirmed on March 18, 2025, that Dr. Kini was being retained to write an expert report. ECF Nos. 204, 205. After more extensions of time to file, Mr. Schulz filed Dr. Kini's "report," titled "Expert Witness Interrogatories & Radiological Findings," on May 12, 2025. Ex. 186. The Special Master considered "[t]he format [to be] unconventional for an expert report" because it is set up as a list of questions posed by Mr. Schulz with corresponding answers by Dr. Kini. *See id*.; ECF No. 233 at 16. Dr. Kini's expert witness timesheet indicates that he spent 20 hours working on this report, reviewing Mr. Schulz's MRI images, corresponding with Mr. Schulz via email, and writing studies. Ex. 187 at 1. Given Dr. Kini's billing rate was $500 an hour, Mr. Schulz's bill was $10,000. *Id*. at 1–2.

Dr. Kini's report consisted of his answers to seventeen questions posed by Mr. Schulz. Ex. 186. These questions included whether Mr. Schulz's intramedullary lesion is "indicative of an acute pathology or vaccine-relate spinal cord injury that is medically relevant to Petitioner's VICP Claim." *Id*. at 3 ¶ 8. Dr. Kini answered that this is possible and "[d]ifferential is broad including vaccine injury but cannot be precisely determined by imaging alone." *Id*. Mr. Schulz also asked whether "the imaging characteristics clearly indicate a specific demyelinating condition," such as multiple sclerosis or transverse myelitis. *Id*. at 5 ¶ 15. Here, Dr. Kini answered that "[a]ll are considered in the differential but they are too nonspecific." *Id*.

The report ends with a one-page "Summary of Radiological Findings" by Dr. Kini. *Id*. at 6. Dr. Kini concluded that, "[g]iven the imaging findings and clinical circumstances, it's entirely reasonable to surmise that the vaccine played a critical role in the development of a demyelinating syndrome, possibly [multiple sclerosis] or the closely related [neuromyelitis optica]." *Id*. (abbreviations expanded).

The Secretary raised concerns about this report in response to Mr. Schulz's motion for interim costs to reimburse Dr. Kini. ECF No. 220; *see* ECF No. 219. The Secretary was concerned about Dr. Kini's role and specialty in relation to this case, asserting that the report's conclusions were "completely unsupported and cannot qualify as more than a scintilla of objective evidence for purposes of establishing reasonable basis." ECF No. 220 at 5–6.

Then, on July 18, 2025, Mr. Schulz informed the court that Dr. Kini would no longer be serving as an expert witness. ECF No. 225. Mr. Schulz subsequently filed a motion to amend Dr. Kini's invoice. ECF No. 228. In this motion, Mr. Schulz advised that:

> Petitioner no longer believes any substantial portion of Dr. Kini's fees are warranted, nor does he believe any portion of Dr. Kini's studies, report or communications should be used when determining

the substantiative nature of his VICP claim.  In the same breath, Petitioner believes reasonable basis still exists and will discuss the above aspects accordingly in his upcoming response for interim fee requests.

*Id*. at 2.

### 4.    The Special Master's Decisions

The Special Master first issued his decision on March 12, 2024.  ECF No. 163.  This nineteen-page decision denied both Mr. Schulz's motion for appointment of counsel and claim of entitlement to compensation.  *Id*.  Specifically, the Special Master held that Mr. Schulz (1) did not demonstrate the exceptional circumstances needed for an appointment of counsel in a civil case, *id*. at 2–4, and (2) did not carry his burden under any of the three *Althen* prongs for compensation purposes, particularly as his claim related to prong three's timing question, *id*. at 15–16.  The Special Master concluded:

> Mr. Schulz has represented himself since November 2019.  To his credit, he has advocated respectfully and courteously during various status conferences.  He has also attempted to comply with various orders.  However, through no fault of his own, Mr. Schulz has not been able to gather evidence to support his claim that an October 17, 2016 flu vaccine caused him to develop transverse myelitis.  Due to the lack of preponderant evidence, Mr. Schulz is not entitled to compensation.  Mr. Schulz has also not shown that extraordinary circumstances warrant an assignment of counsel to represent him.

*Id*. at 18.[9]  Mr. Schulz sought reconsideration because he "was in the process of securing legal counsel when the denial decision was made" and the potential counsel "works with a medical expert who is ideally suited to the Petitioner's medical issues."  ECF No. 164 at 2.  To ensure that Mr. Schulz had every opportunity to present his claims, the Special Master granted this motion and withdrew his decision denying compensation.  ECF No. 165.  Despite his efforts to retain legal counsel and medical experts, Mr. Schulz could not do so in the months that followed.  *See* ECF No. 233 at 22.

The Special Master then issued another decision denying Mr. Schulz compensation and appointment of counsel on August 28, 2025.  ECF No. 233. The Special Master's 2025 denial is very similar to the 2024 denial; adding little more than consideration of evidence that Mr. Schulz added to the record in the fifteen-month interim.  This included a denial of a motion to issue subpoenas filed by Mr. Schulz on September 27, 2024.  ECF No. 183; ECF No. 233 at 23.[10]  The Special Master noted that the analysis underpinning the denials of an appointment of counsel and entitlement to compensation was "contained in the (withdrawn) March 12, 2024 decision.  The

---

[9] *See also* ECF No. 233 at 23 (verbatim).

[10] Because Mr. Schulz did not challenge this portion of the Special Master's decision in his motion for review, the court does not address this issue.  ECF No. 233 at 2–4.

disclosure of this reasoning alerted Mr. Schulz to a problem" which he then had fifteen months to rectify.  ECF No. 233 at 20.  The Special Master addressed why any updates, or lack thereof, during the fifteen-month interim did not affect the outcome of the petition:

> The case was comprehensively reviewed in March 2024.  Then, the evidence did not preponderate in Mr. Schulz's favor.  However, in light of Mr. Schulz's pro se status, the March 13, 2024 decision was withdrawn with the expectation that Mr. Schulz would soon obtain counsel, and counsel would assist him in procuring a report from an expert.  Mr. Schulz's efforts to engage an attorney did not succeed . . . .  After the March 13, 2024 decision, Mr. Schulz has added some new evidence, such as Dr. Musa's report.  But this report does not constitute persuasive proof that the flu vaccination caused Mr. Schulz to suffer transverse myelitis . . . .  Continuing this case would not be in the interest of justice.

*Id*. at 23.

Mr. Schulz now petitions for review of the Special Master's decision.  ECF No. 252.

## II.    Standard of Review

The National Vaccine Injury Compensation Program, created by the National Childhood Vaccine Injury Act of 1986, provides compensation for "a vaccine-related injury or death."  42 U.S.C. § 300aa-10(a).  To receive compensation, the person "who has sustained a vaccine-related injury" must file a petition with the United States Court of Federal Claims Office of Special Masters, naming the Secretary of Health and Human Services as the respondent.  *See id*. §§ 300aa-11(a)(1), (b)(1)(A).

One seeking compensation under the Vaccine Act must have suffered an injury that is either (1) listed on the Vaccine Injury Table or (2) "not set forth in the Vaccine Injury Table but which was caused by a vaccine."  *Id.* § 300aa-11(c)(1)(C)(ii)(I).  For table injuries, the Vaccine Act requires the petitioner to establish the administration of the vaccination and the date of the onset of symptoms, but not causation.  *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1147 (Fed. Cir. 1992).  The Vaccine Act, however, "does not relax proof of causation in fact for non-Table Injuries."  *Id*. at 1148.  Rather, a petitioner alleging a non-Table injury must prove by a preponderance of the evidence that "the vaccine more likely than not caused the condition alleged."  *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014).  That said, "scientific certainty" is not required to establish causation in a non-Table claim.  *Id*. at 1338.

To satisfy the causation standard, the court looks to the *Althen* prongs, which require a petitioner to sufficiently provide "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury."  *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).  The petitioner must prove each prong by a preponderance of the evidence to establish the vaccine

was more likely than not the "but-for" cause of the injury.  *See de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1351 (Fed. Cir. 2008) ("[T]he petitioner need not show that the vaccine was the sole or predominant cause of her injury, just that it was a substantial factor."); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006) (explaining the *Althen* "prongs must cumulatively show the vaccination was a 'but-for' cause of the harm"). Because *Althen*'s prongs are conjunctive, the petitioner must satisfy *all* of its prongs; failing to satisfy any of the *Althen* prongs results in a failure to sufficiently prove but-for causation.  *See Althen*, 418 F.3d at 1278.

Petitioners, therefore, cannot prove causation through "a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury."  *Id*.  "Once the petitioner has demonstrated causation, [he or] she is entitled to compensation unless the government can show by a preponderance of the evidence that the injury is due to factors unrelated to the vaccine."  *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1342 (Fed. Cir. 2010).  Finally, a petitioner cannot demonstrate causation solely based on his or her own claims and opinions if unsubstantiated by medical reports or opinions.  42 U.S.C. § 300aa-13(a)(1); *see also, e.g.*, *Cucuras v. HHS*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

After the special master issues a decision, a party may seek review in this court.  42 U.S.C. § 300aa-12(e)(1).  Once a motion for review is filed, this court has jurisdiction "to undertake a review of the record of the proceedings" and determine whether "any findings of fact and conclusion of law . . . [are] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 300aa-12(e)(2).  The Vaccine Act permits the court to

> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
>
> (C) remand the petition to the special master for further action in accordance with the court's direction.

*Id.*

The arbitrary and capricious review of a special master's findings of fact is "highly deferential."  *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993); *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 889 (Fed. Cir. 1992); *see Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (explaining the court must "uphold a special master's findings unless the court concludes that those findings are arbitrary or capricious").  This court does not "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses" because "these are all matters within the purview of" the Special Master as the fact finder.  *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed.

Cir. 2011); *Munn*, 970 F.2d at 871. And this court does not "second guess the Special Master[']s fact-intensive conclusions" if they "considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hodges*, 9 F.3d at 961; *Hines ex rel. Sevier v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

## III.    Discussion

Mr. Schulz seeks to set aside the Special Master's decision, contending it is arbitrary and capricious in its consideration of each *Althen* prong. ECF No. 252-1 at 17. Mr. Schulz also asks for reconsideration regarding several evidentiary issues. ECF No. 252-1 at 17–20. Mr. Schulz's motion, in essence, asks the court to reweigh evidence considered by the Special Master. *Id*. Such reconsideration is not this court's role. Given that the Special Master reviewed all the evidence before him (after allowing multiple extensions over several years for Mr. Schulz to provide more evidence) under the proper legal standard and drew plausible inferences from that evidence, the court denies the petition for review. *Hines*, 940 F.2d at 1527.

### A.    The Special Master rationally explained that Mr. Schulz failed to satisfy *Althen* prong three.

Because the Special Master began with *Althen* prong three, which he considered to be "the most important" factor for this case, the court starts with prong three as well. ECF No. 233 at 18. To satisfy *Althen* prong three, a petitioner must show "a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278. For this, a petitioner must prove (1) what the "medically acceptable time frame" for the onset of symptoms is and (2) that the injury in question did occur within that time frame. *Pafford*, 451 F.3d at 1358; *de Bazan*, 539 F.3d at 1352 (holding the third prong "requires preponderant proof that the onset of symptoms occurred within a time frame for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact").

Although the Special Master was skeptical of Mr. Schulz's assertion that sixty days was the appropriate time frame and that his tongue numbness (the claimed manifestation of transverse myelitis) arose within sixty days of his vaccination, he did not deny Mr. Schulz's claim on these grounds. Rather, the Special Master concluded that Mr. Schulz failed to demonstrate "a manifestation of transverse myelitis within the appropriate time" because the numbness was most likely caused by something other than transverse myelitis, like drug use (as Mr. Schulz's neurologist contemporaneously advised). ECF No. 233 at 18.

#### 1.    The Special Master Did Not Reject Mr. Schulz's Claimed Medically Acceptable Time Frame

The Special Master considered the Parties' differing views on what constitutes an appropriate time frame for the manifestation of transverse myelitis following a vaccination. According to Mr. Schulz, the appropriate time frame for the manifestation of "'Nervous System Disorders' such as 'transverse myelitis,'" ECF No. 252-1 at 17, is sixty days based on precedent. *See* ECF No. 117 at 10 ¶ 55 ("Petitioner asserts that Respondent and the vaccine court in general have conceded flu vaccines can cause TM and that the acceptable timeframe from administration

11

to onset of symptoms is 60 days, which Petitioner was within."); *see also* ECF No. 138 at 2, 5 (citing *Doe 93 v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 553 (2011)).  The Secretary countered that no expert report nor medical record provided by Mr. Schulz appropriately addressed timing or the question of what is a medically acceptable time frame.  ECF No. 126 at 15–16.

Because Mr. Schulz did not provide a medical opinion to support his assertion that sixty days was an appropriate time frame, the Special Master looked to legal precedent for guidance. *See* ECF No. 233 at 18.  While not bound by these decisions, it was within the Special Master's discretion to consider prior cases.  *E.g.*, *Whitecotton by Whitecotton v. Sec'y of Health & Hum. Servs.*, 81 F.3d 1099, 1104 (Fed. Cir. 1996).  The Special Master found that other cases generally concluded that approximately six weeks was a medically acceptable time frame.  ECF No. 233 at 18 (citing *Halm v. Sec'y of Health & Hum. Servs.*, No. 17-338V, 2017 WL 7513285, at *1 (Fed. Cl. Spec. Mstr. Dec. 19, 2017)).  The Special Master thus concluded that "Mr. Schulz's contention of 60 days does not appear frivolous."  ECF No. 233 at 18.

In the end, the Special Master concluded that he did not need to resolve whether sixty days or some shorter period was appropriate because Mr. Schulz failed to establish the onset of injury within sixty days of his vaccination.  *Id*.  The court therefore turns to consider the onset of injury.

### 2.   The Special Master Rationally Considered the Onset of Injury

The Special Master held that Mr. Schulz did not prove by a preponderance of the evidence that his injury manifested within sixty days of his flu vaccination.  *Id*. at 19.  The Special Master began with the simple premise that the "development of a problem" is not necessarily "a manifestation of a disease."  *Id*. (citing *Rocha v. Sec'y of Health & Hum. Servs.*, No. 16-241V, 2024 WL 752787, at *33 (Fed. Cl. Spec. Mstr. Feb. 1, 2024) ("As a matter of logic, a doctor's detection of a disease does not establish the date the disease began.")).  Here, Mr. Schulz contends that the numbness in his tongue and face establish that he developed transverse myelitis within sixty days of his vaccination.

The Special Master considered manifestation in two parts: (1) whether Mr. Schulz's numbness manifested within the appropriate time frame; and (2) whether Mr. Schulz's numbness could be considered a manifestation of transverse myelitis.

> *a)*      *Although skeptical, the Special Master did not deny Mr. Schulz's assertion that his numbness began within sixty days of his vaccination.*

Mr. Schulz contends that the numbness and/or tingling in his tongue and face began by November 16, 2016.  ECF No. 233 at 19 (citing Am. Pet. ¶¶ 9–11).  He relies on a discussion of this numbness with a doctor on December 3, 2016.  *Id*.  The Secretary has a different view of onset, arguing that the numbness began around January 25, 2017, when Mr. Schulz complained about it to the dentist and then to Dr. Navarro.  ECF No. 126 at 16 (citing Exs. 6-2 at 3–5, 7 at 8–10); Ex. 4; *see also* Ex. 23, EMBGRMCRP 2018-2-26 at 11 (a March 2017 report where Mr. Schulz claimed numbness began roughly a month prior).

12

The Special Master determined that, while Mr. Schulz's claim that his numbness began in November 2016 is *plausible*, this does not establish that he developed transverse myelitis at that time. ECF No. 233 at 19. But here too the Special Master determined that he did not need to determine whether the numbness began in November 2016, December 2016, or January 2017, which would require additional evidence, because he concluded that Mr. Schulz failed to establish that the numbness he experienced was related to transverse myelitis. *Id*.

Mr. Schulz, in this motion for review, argues the Special Master acted arbitrarily and capriciously by "ignoring" evidence, such as his wife's affidavit that Mr. Schulz reported tongue numbness to the emergency room provider on December 4, 2016. ECF No. 252 at 11 n. 18 ("Why the SM is faulting Petitioner for [the tongue numbness claim not appearing in the emergency room records] while ignoring sworn affidavits from a witness to the fact remains to be answered."); *see also* Ex. 35. But the Special Master considered the wife's statement and afforded it little weight. *See* ECF No. 233 at 6.

> b)    *The Special Master reasonably concluded that Mr. Schulz failed to establish by a preponderance of the evidence that his numbness was due to transverse myelitis.*

Mr. Schulz faces a larger problem—the Special Master's finding that there is no medical evidence connecting tongue and face numbness to transverse myelitis. ECF No. 233 at 19–20. As the Special Master recognized, "[n]o doctor has diagnosed isolated tongue numbness as a symptom of transverse myelitis." *Id*. at 19. This conclusion is supported by the record, which shows Mr. Schulz's doctors considered the numbness to be related to other issues. When Mr. Schulz complained of the numbness to Dr. Navarro, he prescribed medication for lower back pain. Ex. 7 at 8–10. And more pointedly, when Mr. Schulz raised the numbness to his neurologist, Dr. Sun told him to stop "sucking on a bong" and that the numbness would likely go away. Ex. 6-4 at 2. In the end, the Special Master found that Mr. Schulz had not established by a preponderance of the evidence that the C2-C3 lesions associated with transverse myelitis would cause tongue or facial numbness. ECF No. 233 at 20. Thus, the Special Master concluded that, even if Mr. Schulz could prove a manifestation of numbness within a medically appropriate time frame, Mr. Schulz failed to establish by a preponderance of the evidence that the numbness was caused by transverse myelitis. *Id*. Given the record before the court, the Special Master's conclusion is amply supported.

This conclusion was nothing new to Mr. Schulz. The Special Master concluded that Mr. Schulz failed *Althen* prong three in the March 12, 2024, decision that he withdrew to allow Mr. Schulz more time to put forward medical evidence. *Id*.; *see* ECF No. 163. Pages fifteen through seventeen explained—in nearly identical terms as the current decision—that Mr. Schulz's arguments under prong three were not persuasive. *Id*. at 15–17. Thus, "this reasoning alerted Mr. Schulz to a problem" which he had fifteen months to rectify. ECF No. 233 at 20. But Mr. Schulz has not done so. He presented a report of sorts from Dr. Musa, which did not contend that the tongue numbness was a manifestation of transverse myelitis.

In his motion for review, Mr. Schulz disagrees with these conclusions, claiming the Special Master is "flat out ignoring a treating provider[']s statement that specifically ties the inflammation in [his] cervical spine to the numbness in [his] tongue through the trigeminal

13

nerves." ECF No. 252-1 at 18 & n. 15.  Mr. Schulz also specifically pointed to evidence from Dr. Pardo-Villamizar and Dr. Bass, contending, for instance, that "[t]he Court seems to be arbitrarily ignoring Dr. Pardo's statement linking tongue numbness to TM." *Id*. at 18 n. 15.

But the record disproves these assertions.  First, the Special Master explicitly considered the visits with Dr. Pardo-Villamizar at Johns Hopkins and recognized the doctor's statement that he could not opine on the cause of Mr. Schulz's symptoms, including the numbness.  ECF No. 233 at 10 (citing Ex. 19-2 EMRJH 2020-7-22 AAR (audio recording) at 24:37).  This was consistent with Dr. Murphy, also of Johns Hopkins, who stated that "[t]he etiology of the myelitis is uncertain."  Ex. 19-1 at 3–5 (June 3, 2020).

Second, the records involving Dr. Bass were not provided until after the Special Master issued his decision on August 28, 2025.  *See, e.g.*, Exs. 200, 201, 206, 210 (filed Sept. 8 & 16, 2025).  The Special Master first addressed these records in response to a motion to reconsider and explained why they do not change the result of this case.  In denying reconsideration, the Special Master concluded that Dr. Bass was only willing to discuss the *possibility* that the influenza vaccine triggered Mr. Schulz's autoimmune disease.  ECF No. 240 at 3, 5.

After the Special Master denied reconsideration, Mr. Schulz filed what he called a status report that explicitly argued against the Special Master's holdings under the *Althen* prongs, the denial of reconsideration regarding Dr. Bass, and the weight of various evidence.  ECF No. 246 at 2–8.  In response to this filing, the Special Master explained that "as to whether tongue numbness could be associated with a lesion detected at C2-3, Mr. Schulz asked Dr. Bass about this.  However, Dr. Bass appears not to have answered the question." *Id*. at 2.  Nor did Mr. Schulz come forward with anything from Dr. Bass following his July 2025 appointment providing more support for his claim (e.g., a follow-up from Dr. Bass further supporting Mr. Schulz's claim).

In the end, the Special Master afforded little weight to Dr. Bass's statements because the doctor did not answer the question when asked if Mr. Schulz's numbness could be linked to the cervical spine lesions.  This court does not reweigh evidence; the Special Master considered years of factual and procedural history in coming to a reasoned and thoroughly explained decision.  Thus, the court upholds the Special Master's *Althen* prong three findings and conclusions because they are neither arbitrary nor capricious.  The Special Master considered the evidence under the proper legal standard and provided a rational and reasoned explanation for his conclusion.

Because Mr. Schulz did not carry his burden under *Althen* prong three, the Special Master's analysis could have ended given that "a failure to satisfy one [*Althen*] prong is fatal to the case." *DePena v. Sec'y of Health & Hum. Servs.*, 133 Fed. Cl. 535, 549 (2017) (internal citations omitted), *aff'd per curiam*, 730 F. App'x 938 (Fed. Cir. 2018); *see W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1358 (Fed. Cir. 2013).  Because the Special Master considered *Althen* prongs one and two as well, and Mr. Schulz challenged those findings, the court considers them as well.

> **B.    The Special Master rationally explained that Mr. Schulz failed to satisfy
> *Althen* prong one.**

*Althen* prong one requires proof by the preponderance of the evidence of a "medical theory causally connecting the vaccination and the injury." *Althen*, 418 F.3d at 1278. The petitioner "must provide a 'reputable medical or scientific explanation' for [the] theory." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (quoting *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010)). Although the theory must be "sound and reliable," the petitioner need not prove it with "medical or scientific certainty." *Id.* (quoting *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548–49 (Fed. Cir. 1994)). "The assessment of whether a proffered theory of causation is 'reputable' can involve assessment of the relevant scientific data. Medical literature and epidemiological evidence must be viewed, however, not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard[.]" *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1380 (Fed. Cir. 2009).

Mr. Schulz argued that he met his burden with *Askew v. Sec'y of Health Hum. Servs.*, No. 10-767V, 2012 WL 2061804 (Fed. Cl. Spec. Mstr. May 17, 2012). In *Askew*, a special master relied on a medical article submitted by the petitioner to connect a loss of sensation to the onset of transverse myelitis. *Id.* at *7. But special masters are not bound by other decisions and can reach different outcomes based on different facts. *Trollinger v. Sec'y of Health & Hum. Servs.*, 167 Fed. Cl. 127, 140–41 (2023). And it is also true that "special masters have not universally agreed that the flu vaccine can cause transverse myelitis." *Pearson v. Sec'y of Health & Hum. Servs.*, No. 16-9V, 2019 WL 3852633 (Fed. Cl. Spec. Mstr. July 31, 2019); *Bowling v. Sec'y of Health & Hum. Servs.*, No. 18-109V, 2023 WL 6846491 (Fed. Cl. Spec. Mstr. Sept. 20, 2023)).

*Askew* aside, the Special Master held that Mr. Schulz did not provide a reputable medical or scientific explanation that could causally connect the influenza vaccine he received to transverse myelitis. ECF No. 233 at 21. Here too the analysis remained largely unchanged from the withdrawn opinion, which suggests that, if Mr. Schulz could have mustered up evidence to support his theory, he would have done so in the fifteen months between when the Special Master withdrew his first opinion and when he issued the current decision. Although recognizing that Mr. Schulz improved his case slightly with Dr. Musa's report, the Special Master concluded that this report did not carry Mr. Schulz's burden. *Id*. This was because Dr. Musa merely opined that "it is reasonable to consider that Mr. Schulz's symptoms may be linked to a vaccine-induced immune response." Ex. 150 at 4. Simply stating that it is "reasonable" to conclude that Mr. Schulz's symptoms "may be linked" to the vaccination does not establish the causation required under *Althen* prong one. Merely stating something may be linked to a vaccination does not carry the burden under *Althen* prong one. *Austin v. Sec'y of Health & Hum. Servs.*, 141 Fed. Cl. 268, 280 (2018) (a statement of "possible" did not support causation), *aff'd*, 818 Fed. Appx. 1005 (Fed. Cir. 2020); *Frescano v. Sec'y of Health & Hum. Servs.*, 99 Fed. Cl. 28, 34 (2011) (a statement of "suspicion" is not preponderant evidence); *Horn v. Sec'y of Health & Hum. Servs.*, 19 Cl. Ct. 439, 450 (1990) (a statement of "highly possible" is not preponderant evidence). This was a thorough and reasoned analysis by the Special Master, and the court cannot second-guess his weighing of the evidence.

Mr. Schulz also submitted new evidence after the Special Master issued his decision, again attempting to establish that medical or scientific explanations can connect the vaccination to transverse myelitis. ECF No. 252-1 at 18–20; *see, e.g.*, ECF No. 239. This evidence, Exs. 200–212, constitute several of Mr. Schulz's medical records and medical literature. Mr. Schulz

15

provided an audio recording and transcript of an appointment with Dr. Bass, Exs. 200–201; genetic testing results, Ex. 202; affidavits from his wife, Exs. 203, 207; medical malpractice information from a textbook, Ex. 204, a Quest Diagnostics invoice, Ex. 205; notes from an appointment with Dr. Bass, Ex. 206; Google screenshots about his symptoms, Ex. 208; medical payment screenshots, Ex. 209; a summary of a visit with Dr. Bass, Ex. 210; a medical journal article on transverse myelitis and vaccines, Ex. 211; and a medical journal article on trigeminocervical nucleus, Ex. 212.  In his motion for review, Mr. Schulz argued the Special Master disregarded this new evidence, which would have established a causal connection.  ECF No. 252-1 at 18–20.  But the Special Master specifically addressed this new evidence in denying the motion for reconsideration and found it did not establish causation.

First, insofar as Mr. Schulz submitted DNA results that he received on April 14, 2025, he did not explain why those results were not provided to the Special Master until after the issuance of the final decision.  Put simply, this DNA evidence was not newly discovered when Mr. Schulz sought reconsideration; he obtained the evidence months before the Special Master's decision and did not raise it in briefing or in at least one status conference.  ECF No. 240 at 4; *see* Ex. 202.  The Special Master would have been within his discretion rejecting this evidence.  *Ingham Reg'l Med. Ctr. v. United States*, 155 Fed. Cl. 1, 10 (2021).

Second, the Special Master explained that "even if this newly-asserted information is considered, special masters have regularly held that homology is insufficient to establish a causal relationship between a vaccine and an injury under *Althen*."  ECF No. 240 at 4 (citing *Tullio v. Sec'y of Health & Hum. Servs.*, No. 15-51V, 2019 WL 7580149, at *15 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), *aff'd*, 149 Fed. Cl. 448 (2020)) (additional citations omitted).  While Mr. Schulz insists that he "not only had the homology" but "had the symptoms," the Special Master was reasonable in deciding that homology is an insufficient medical theory for proving the flu vaccine more likely than not caused an onset of transverse myelitis.  *See* ECF No. 252-1 at 19.

Mr. Schulz provides no expert records or testimony to sufficiently support any medical theory establishing a causal connection.  The Special Master thoroughly weighed Mr. Schulz's evidence—even the evidence presented after the decision was published—under the proper standard and found it to be lacking.  As a result, the Special Master's conclusion that Mr. Schulz did not meet his burden under *Althen* prong one by a preponderance of the evidence is not arbitrary or capricious.  This court will not disturb it.

### C.    The Special Master rationally explained that Mr. Schulz failed to satisfy *Althen* prong two.

*Althen* prong two requires a petitioner to establish by a preponderance of the evidence "a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen,* 418 F.3d at 1278.  "There may well be a circumstance where it is found that a vaccine *can* cause the injury at issue and where the injury was temporally proximate to the vaccination, but it is illogical to conclude that the injury was actually caused by the vaccine."  *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1327 (Fed. Cir. 2006).

Because Mr. Schulz has no retained expert, he could only rely on the opinions of his treating physicians.  *See* 42 U.S.C. § 300aa-13(a).  The Special Master was appropriately vigilant

to ensure that "statements presenting a sequence of events must be distinguished from statements of causation." ECF No. 233 at 22 (collecting cases). After considering the evidence, the Special Master found that the evidence did not support that the flu vaccine was a cause for transverse myelitis. *Id*. Mr. Schulz's treating physicians came to varying conclusions, with some refusing to opine, some stating that connection was "impossible to say," and some saying alternative explanations and causes were equally possible. *Id*. (citing ECF No. 117 at 13–14; Exs. 3-17 at 2–3, 6-4 at 2, Exhibit 19-2 EMRJH 2020-7-22 AAR (audio recording) at 24:37).

The Special Master also explained that Dr. Musa's report merited little weight because Dr. Musa would not conclude that the vaccine "probably caused" transverse myelitis. *Id*. (citing Ex. 155). Rather, Dr. Musa concluded only that Mr. Schulz's symptoms "may be linked to a vaccine-induced immune response." Ex. 155 at 21. Considering the lack of other evidence demonstrating a logical sequence of cause and effect, the Special Master found this potential for causation was insufficient for carrying Mr. Schulz's burden of proof. *See Nieves v. Sec'y of Health & Hum. Servs.*, 167 Fed. Cl. 422, 429 (2023) (finding that a "possible" cause and effect relationship does not necessarily support causation).

In his motion for review, Mr. Schulz does not explicitly address *Althen* prong two beyond discussing the points already addressed above. As the Special Master considered all evidence presented under the proper standard and reasonably assigned weight to this evidence, the court will not disturb his conclusion.

### D.    Motions to Issue Subpoenas

Mr. Schulz separately contends the Special Master was arbitrary and capricious in denying his motions to issue subpoenas. Mr. Schulz contends that his ability to litigate has been complicated by the Special Master "denying requests for subpoena power to obtain records" from the UT System and Bexar County Hospital District. ECF No. 252 at 12–13; ECF No. 252-1 at 1–16 ("The Special Master abused his discretion by denying Petitioner's motions to obtain critical evidence – specifically, the motions for appointment for subpoena authority to obtain an unredacted VAERS report, certified medical records and records pertaining to 42 U.S.C. 300aa-25 . . . ."); *see, e.g.*, ECF No. 183. Mr. Schulz claims that a subpoena is needed as the medical records received from these entities are incomplete, due to an exclusion of audio records, the use of certain entity names on records, a lack of a certification of authentication, and more. ECF No. 183 at 8–9. His argument is that "[s]uch an order is necessary to uphold Petitioner's due process rights and to ensure a fair and thorough adjudication of his vaccine injury claim." *Id*. at 12. No other explanation is provided for how a subpoena would help Mr. Schulz satisfy his burden of proof.

In his decision, the Special Master concluded that this additional evidence "is highly unlikely to change the outcome" as Mr. Schulz failed to "persuasively argue[] that treatment records are likely to fill any gaps in his case." ECF No. 233 at 23. The Secretary similarly argues that the Special Master was justified in his denial, given these additional records "were unlikely to shed light on the fatal issues" in this case. ECF No. 254 at 11. Considering Mr. Schulz did not establish any of the *Althen* factors, the evidence that he sought would not likely change the outcome. For example, there is nothing in the evidence Mr. Schulz claims to need that would (1) appear to connect tongue numbness to transverse myelitis (*Althen* prong three), (2) connect the flu vaccine to transverse myelitis (*Althen* prong one), or (3) help establish that the

17

vaccine was likely a cause of Mr. Schulz's transverse myelitis (*Althen* prong two).  The denial of Mr. Schulz's motion for authority to issue subpoenas provides no basis to disturb the Special Master's decision.

## IV.    Conclusion

For these reasons, the court DENIES Petitioner's motion for review, ECF No. 252.  The Clerk's Office is DIRECTED to enter judgment for the United States accordingly.

It is so ORDERED.

<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge